WR 59,201-03
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 4/20/2015 12:00:00 AM
Accepted 4/20/2015 8:11:52 AM
ABEL ACOSTA
CLERK

**WR 59,201-03**

**EX PARTE RICHARD VASQUEZ**

RECEIVED
COURT OF CRIMINAL APPEALS
4/20/2015
ABEL ACOSTA, CLERK

\* \* \*

IN THE DISTRICT COURT
148TH DISTRICT
NUECES COUNTY, TEXAS

Returnable to

THE TEXAS COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS

\* \* \*

**STATE'S MOTION TO DISMISS AS ABUSIVE
SUBSEQUENT 11.071 APPLICATION FOR
WRIT OF HABEAS CORPUS
AND TO DENY MOTION TO STAY EXECUTION**

Douglas K. Norman
State Bar No. 15078900
Assistant District Attorney
105th Judicial District of Texas
901 Leopard, Room 206
Corpus Christi, Texas 78401
(361) 888-0410
(361) 888-0399 (fax)
douglas.norman@co.nueces.tx.us

Attorney for the State

1

**WR-59,201-03**

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE DISTRICT COURT** |
| | § | |
| | § | **148TH JUDICIAL DISTRICT** |
| | § | |
| **RICHARD VASQUEZ** | § | **NUECES COUNTY, TEXAS** |

COMES NOW the State of Texas, by and through its Assistant District Attorney for the 105th Judicial District of Texas, and pursuant to Texas Code of Criminal Procedure arts. 11.071 and 11.073, files this motion to dismiss as abusive the present subsequent application for writ of habeas corpus and to deny the motion to stay execution.

### EXPLANATION FOR UNTIMELY PLEADING

The State is cognizant of this Court's "Miscellaneous Rule 11-003" pertaining to procedures in death penalty cases involving requests for stay of execution and related filings, and if it applies to responsive pleadings such as this motion to dismiss Applicant's subsequent application for writ of habeas corpus, the State offers this explanation for filing its motion less than seven days before the date of Applicant's execution:

Applicant's execution is scheduled for Thursday, April 23, 2015. Applicant did not file his motion for stay of execution and his subsequent application for post-conviction writ of habeas corpus until late in the

2

afternoon of Wednesday, April 15, 2015, the last day permitted for such filings pursuant to this Court's "Miscellaneous Rule 11-003." Consequently, it was impossible for the State to read and file a response to the 92-page application and exhibits attached thereto prior to the expiration of the deadline for a timely filing in this case. The State has worked diligently to prepare such response and is filing this, its motion to dismiss Applicant's subsequent application for writ of habeas corpus as quickly as it can.

The State prays that this Court deem such circumstances as good cause for the untimely filing of this motion, if in fact this motion is considered a "pleading requesting affirmative relief in an impending execution case" under Miscellaneous Rule 11-003, and if in fact that rule applies to responsive pleadings such as this motion to dismiss.

**STATEMENT OF FACTS**

The State relies on this Court's own knowledge of the facts of the case as set forth in its opinion on the direct appeal. In addition, the State would point this court to the following testimony that it believes to be particularly relevant to the present claims being made.

Deputy Constable Eric Giannamore, the first person to arrive at the scene, asked Vasquez what had happened. Vasquez replied that Miranda was

3

brushing her teeth in a hall bathroom and fell off a wooden stool, hitting her head.  Giannamore testified, however, that there was no wooden stool in the area. (R.R. XXXIV - 19-21, 74-77; XLI - State's Exh. 37).

Emergency medical technician Eugenio Rangel asked what had happened and Vasquez replied that Miranda had fallen off a stool in the bathroom while brushing her teeth. While Vasquez kind of pointed when he said this, Rangel never saw a stool in the area. (R.R. XXXV - 76-78, 83, 85, 101, 108).  As the paramedics cut Miranda's clothes off and turned her in order to place her on a back board, noticeable bruising of various stages was apparent down her back, as well as on her legs and arms. Miranda also had a bump on the back of her head and bruising around her eyes. There was no sign of toothpaste in Miranda's mouth. (R.R. XXXIV - 21-22; XXXV - 78-82, 85-87, 93-98, 101-102, 108-112; XLI - State's Exh. 37-39).

Dr. Michael Burke, a pediatric neurosurgeon, testified that Miranda had multiple bruises on her body. (R.R. XXXV - 95; XXXVI - 69-89; XLII - State's Exh. 60-63; C.R. I - 38-39, 51-53, 56-61, 69-71, 156-158).  Burke said that her subdural hematoma was caused by trauma to the head and that Miranda's brain injuries were the equivalent to those she would have sustained had she been ejected from a car traveling 65 m.p.h. Miranda's injuries were consistent with being struck multiple times in the head. Burke

4

said his final diagnosis was severe brain injury from child abuse. He described this as a massive injury and summarized Miranda's condition by saying, "This child got the living daylights beat out of her to the point that she quit breathing and there was nothing that could be done at that point." (R.R. XXXVI - 78-79, 87, 91-94). Dr. Burke used his car accident and Shaken Baby Syndrome comments only as analogies to attempt to explain the force of the direct impact injuries in the present case and the lack of external signs, and he never testified or implied that Miranda had been in a car accident or that she had Shaken Baby Syndrome. (R.R. XXXVI - 92-93).

Leann Box, a sexual assault nurse examiner (SANE) at the hospital, testified that Miranda had extensive bruising in various stages of healing all over her body--head, face, chest, pelvic region, genitalia area, ankle, thigh, shoulder, back, and arms--and described each of those bruises. (R.R. XXXV - 175-185, 208-211; XLI - State's Exh. 46-48; C.R. I - 23, 27, 75-83, 175). There were multiple abrasions and tears on her labia majora, fossa, labia minora, fourchette, perineum, and anal area. Many were oozing tears, which meant they were fresh enough that they had not begun to scab, which generally started to occur within a few hours of injury. One such injury would have probably bled a great deal. Because very little blood was present

in the area when the examination took place, Box assumed it had been cleaned up. (R.R. XXXV - 185-197, 205-208, 211-215; XLII - State's Exh. 49-57; C.R. I - 18-21, 42, 50, 54-55, 72). The bruising on Miranda's hips was very consistent with injuries that could be caused by being held from behind while being sexually assaulted. The injuries to Miranda's genital-anal area were not consistent with a straddle injury. Rather, they were extremely consistent with someone or something passing over the area below the anus, tearing the top of the skin, skidding over the anus, and ripping apart the skin at the perineum. In over 200 sexual assault examinations, this was the first time Box had seen a complete full thickness tear at the perineum. (R.R. XXXV - 177, 197-200).

In his formal statement to the police, Vasquez said that he had repeatedly asked Miranda why she always acted scared of him. She kept saying she was not scared of him until Vasquez "got pissed off" and pushed her. When she still replied that she was not scared of him, Vasquez told her to stop lying and hit her in the head. She did not fall down because he was holding her with his other hand. He hit her several more times. She just looked at him and looked stunned. He told her to go out and play and she went downstairs and out of the house. About 30 minutes later, Vasquez called out to Miranda through the window and told her to come inside and

6

brush her teeth or she would not get to go to his sister's house. When she walked in, Miranda's head was down. She went to Vasquez's mother's room and got the stool she used when she brushed her teeth. As she started to carry it to the other bathroom, she fell down. Vasquez told her to get up and go brush her teeth. Miranda staggered into the bathroom and began to brush her teeth. Then Vasquez heard what sounded like the stool tipping over. He called Miranda but she did not answer. He went in the bathroom and saw her lying on her back on the floor. He hit Miranda because he had a lot of anger because he couldn't straighten his life out. He could have hit her more than three times. He just lost it. He was sorry for what he did to her. (R.R. XXXIV - 56-59; XLI - Sx8).

Dr. Lloyd White, the Nueces County medical examiner who performed an autopsy on Miranda's body, noted bruising all over her body and head of various ages. (R.R. XXXVI - 23-33, 40, 49-50; XLII - State's Exh. 58-59). The damage to Miranda's genital region was typical of blunt trauma--pressure exerted to the area that caused scrapes of the skin and membranes and caused tears of those membranes. They could have been the result of being poked with an object. A penis could cause bruising, laceration, and fairly severe injuries in small children. (R.R. XXXVI - 39-40, 53-54, 58). White said the cause of Miranda's death was blunt force

7

injuries of the head and brain with cocaine intoxication as a contributing factor. He ruled the manner of death to be homicide. White could not say how many blows Miranda received but there were at least 20-30 areas of contusion on her body, including evidence of perhaps dozens of impacts to all areas of her head--back, under the chin, front, either side, and top. The bruising around Miranda's eyes, ear, surrounding face, and scalp, which was edematous, was due to recent impact. He could also not say how hard she was struck except that it was hard enough to produce fatal injury. He said it was very unlikely that Miranda would die from falling off the stool. White was of the opinion that the bruises to Miranda's back and chest were not the result of resuscitation efforts. The bruises to Miranda's hips were consistent with her being restrained and sexually assaulted from behind. (R.R. XXXVI - 38-43, 55-57; XLI - State's Exh. 45; C.R. I - 31-36). Dr. White explained that most fatal falls require at least 10 to 15 feet in height, but conceded that "[f]alls from so-called ground level or falls from a very low level producing fatal injuries are very, very rare; although they do occur." (R.R. XXXVI - 41-42).

Dr. James Lukefahr, a pediatrician who devotes a large part of his practice to child abuse, testified that he had reviewed the medical records and photographs in the case, and was of the opinion that Miranda's injuries

8

were the result of a sexual assault. He discussed the various injuries to the genital-anal area, noting in particular the large penetrating injury into the perineal body. That injury was quite deep as evidenced by deeper tissues which were visible in the photographs and the fact that a doctor had had to repair it with sutures that were completely buried well beneath the surface of the skin. Lukefahr said that the injuries were not consistent with a straddle injury. The bruises on Miranda's hips were very unlikely to be accidental because they were localized in an area that would generally be well cushioned by clothing. Lukefahr opined that they were sustained during the sexual assault and were probably the result of being restrained during the time the really violent act of penetration was occurring in Miranda's anal area. The injuries were also unusually symmetrical. They were more consistent with Miranda being conscious and struggling when they occurred than being sustained when she was unconscious. There was a suggestion that Miranda's anus had been penetrated but Lukefahr could not say for sure. The fact that semen was not found did not change Lukefahr's opinion that a sexual assault had occurred. He felt that most of the injuries were most consistent with having been caused by contact with an object which was in motion, so that the skin basically was rubbed off in those areas. The really deep wound in the perineal body, on the other hand, was a penetrating injury,

9

caused by an object penetrating into the substance of the perineal body. It would have taken a very substantial amount of penetrating force to have caused that injury because that area of the body has a lot of resilience and padding. There was no way to know whether that injury was caused by a man's penis or some other foreign object.

Vasquez testified in his own defense that he was mad and hit Miranda in the head. While he acknowledged hitting her in the head, Vasquez denied hitting her in her face. She was not doing anything wrong that required discipline. He claimed to not know how many times he hit her. Although in his written statement, Vasquez said he held Miranda by the head when he hit her, he testified that he did not do so. (R.R. XXXVII - 92-94, 116-117, 121-122, 135). When Miranda appeared, she looked dazed and could not keep her head up. Vasquez knew something was wrong with her. He told her to get her stool from his parents' room and go brush her teeth. As she returned with the stool, she fell down. She still could not keep her head up. (R.R. XXXVII - 94-96, 112-113, 136). Vasquez later went into the bathroom and found her with her head down and toothpaste on her face, and still later went back to the bathroom and found her with her head in the sink. He thought she hit her head with the faucet although he could not recall what type of faucet it was. (R.R. XXXVII - 96-97, 119-121). Vasquez repeatedly tried to

10

make Miranda stand by herself but she kept falling down. He then shook her and asked her what was going on. As he did that, he took her into his parents' bedroom and either threw or laid her on their bed. (R.R. XXXVII - 97-99, 117, 140). Vasquez said he did not try to kill Miranda and he did not know what his intent was when he hit her. He did not remember whether he had hit her until she became unconscious. (R.R. XXXVII - 110, 134-135, 140-141, 147). Vasquez admitted that he was the only adult in the house that morning. (R.R. XXXVII - 113, 125-126).

### STATE'S RESPONSE TO THE PRESENT CLAIMS

The crux of all of Vasquez's claims in this subsequent writ is that new scientific evidence supposedly shows that the victim's fall from a small stool might reasonably have caused her fatal injury, contradicting trial testimony from Dr. Burke and Dr. White implying that this was not a plausible theory. Specifically, in the "Introduction" to his application, Vasquez asserts that "[i]n light of modern scientific knowledge, it is now clear that the child had actually died after falling from a stool, and that the science underlying the State experts' conclusions [that Vasquez beat her to death] was fundamentally flawed." (Subsequent Application p. 6) In discussing his primary claim, Vasquez further explains his claim that "science has now clarified that short falls, such as the one taken by Miranda from the stool,

11

can and in fact do cause the type of catastrophic head injury observed upon Miranda's arrival in the emergency room." (Subsequent Application p. 16) Vasquez's other claims of new evidence regarding Shaken Infant Syndrome, biomechanics, and Second Impact Syndrome are either dependent upon the validity of the fall theory or are clearly unsupported and insufficient to justify relief.

Certainly it might be possible to imagine a case where the defendant claimed at trial that the victim fell from a sufficient height to have caused a fatal injury, where that theory was discredited by expert testimony considered valid at the time, and where new scientific evidence would suggest that the theory in question was a valid explanation for the fatal injury based on data comparing substantially similar fatal and non-fatal falls. Such a case might justify relief under Article 11.073. This is not that case, for many reasons.

This was not a case of a single head injury that could equally have been explained by either an intentional blow or an accidental fall. It was multiple blows to the head, as admitted by Vasquez himself, causing severe and extensive injury to the brain. This was not a case of an otherwise loving parent who had no proclivity to hurt the child in question. Vasquez was clearly an abusive parental figure by anyone's measure, who the evidence

12

suggests not only hit the victim but also lethally injected her with cocaine and sexually assaulted her. This was not a case of an accidental fall from two-to-ten feet in the air. It was a stepping stool depicted in SX # 16 and which the State has measured to be approximately 10&1/2 inches high. (See Appendices A & B). This is not a case where the fall in question had been seen by some disinterested witness or otherwise verified. Vasquez was the only adult home at the time, the emergency responders did not even see the stool in question, and no toothpaste was found in the victim's mouth, in spite of the fact that she had supposedly been brushing her teeth when she fell and lost consciousness.

**Supporting Affidavits.**

Vasquez has attempted to support his "new science" allegations with attached affidavits from two pathologists, Dr. Thomas Young and Dr. Waney Squier. These affidavits fall far short.

*Dr. Young's Affidavit.*

Dr. Young, in his affidavit, pointed to two journal articles that supposedly "falsified the notion that short falls do not cause death in children." (Exhibit A, Young Affidavit p. 3) However the two medical articles cited by Dr. Young do not even involve fatal brain injuries from falls that could reasonably be compared with the present short fall from a

13

10&1/2-inch stool by four-year-old Miranda.

*Fatal Pediatric Head Injuries Caused by Short-Distance Falls* (See Appendix C) – The only children four years and older who died from falls fell from at least three feet or from an undetermined height at least two feet but possibly as much as six to eight feet, these being falls from a swing. The falls in the study were from playground equipment and not from falling off something like a stool in the home. It stands to reason that the dynamics and motions involved in falling from a swing or other movable playground equipment are different from those involving in falling from a stationary stool, as well as the nature of the surface or structure onto which the child fell.

*Delayed Sudden Death in an Infant Following an Accidental Fall* (See Appendix D) – The case study involved only one death of a nine-month-old, who fell from a bed some 30 inches high, onto a concrete floor. The authors of the case study admit that "lethality of short falls … are still controversial. One widely held belief is that short falls are almost never fatal." The authors further submit, "We do not argue the widely noted observation that simple falls from low heights rarely result in significant primary brain injury." (p. 373)

Moreover, both of these articles are based strictly on data from cases

where the falls in question did cause death, and do not contain data or comparisons with cases of non-fatal falls. Accordingly, there is no attempt in either article to address the frequency with which short falls of this nature are fatal or to refute the proposition that in the vast majority of cases short falls are not fatal, as is consistent with Dr. Burke's and Dr. White's testimony at trial.

Although Dr. Young also disagreed with certain statements made by Dr. Burke at trial concerning Shaken Baby Syndrome and comparison with injuries suffered in a high speed car accident, and with Dr. White and Dr. James Lukefahr's opinions concerning sexual assault , he offered nothing to support a "new science" claim on these grounds. (Exhibit A, Young Affidavit pp. 3-4)

*Dr. Squier's Affidavit.*

Dr. Squier, in her affidavit, asserted that "Miranda's primary cause of death was blunt force injuries to the head consistent with a fall from a stool," and that "[t]he strikes to Miranda's head by Mr. Vasquez, on their own, were probably insufficient to cause fatal injuries." However, she bases this conclusion on an unverified assumption that Vasquez, the only adult present at the time, was telling the truth about the sequence of events at the time of the injury. (Exhibit B, Squire Affidavit p. 2)

15

Dr. Squier also disagreed with Dr. Burke's Shaken Baby Syndrome and high speed accident analogies, but not based on any "new science." On the contrary, Dr. Squier attempts to support her assertions based on a study published in 1987, well before Vasquez's trial. (Exhibit B, Squire Affidavit p. 3, n.2)

The only assertions that Dr. Squier makes that are arguably supported by new science involve her Second-Impact Syndrome claim that Miranda died as a result of the combined impact of being initially hit by Vasquez and then falling from the stool. (Exhibit B, Squire Affidavit p. 4) However, as discussed below, under Texas' law concerning concurrent causation, this would not have relieved Vasquez of responsibility for the death.

**Concurrent Causation.**

With regard to causation, the Penal Code provides that "[a] person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." Tex. Pen. Code Ann. § 6.04 (a). The Court of Criminal Appeals has interpreted this to mean that, "[i]f the additional cause, other than the defendant's conduct, is clearly sufficient, by itself, to produce the result *and* the defendant's conduct, by itself, is clearly

16

insufficient, then the defendant cannot be convicted." *Robbins v. State*, 717 S.W.2d 348, 351 (Tex. Crim. App. 1986); *see also Turner v. State*, 435 S.W.3d 280, 283 (Tex. App.—Waco 2014, pet. ref'd).

In the present case, there is no showing that Vasquez's repeated blows to Miranda's head were clearly insufficient to cause her death, and it remains highly unlikely that her fall from a short stool would have been sufficient, by itself, to cause the death. Accordingly, even under the supposedly newly-developing science of Second-Impact Syndrome, Vasquez cannot escape responsibility for her murder.

In addition, Vasquez's initial blows arguably themselves caused Miranda to be in such a dazed state that she fell from the stool in question, making the second impact as well a direct result of his own conduct.

**The Prejudice Prong.**

In order to prevail under 11.073, the Court not only has to find that there is new, admissible, previously unavailable scientific evidence, but also that "had the scientific evidence been presented at trial, on the preponderance of the evidence, the person *would not have been convicted*." (Emphasis added).

In the present case, even if some or all of the "new science" arguments are found to have some validity, it is highly unlikely that this new

science would have changed the outcome, as the evidence of guilt was overwhelming.

## PRAYER

WHEREFORE, the State prays that the Court will dismiss as abusive the present subsequent application for writ of habeas corpus and deny the motion to stay execution.

Respectfully submitted,

/s/ *Douglas K. Norman*

_____
Douglas K. Norman
State Bar No. 15078900
Assistant District Attorney
105th Judicial District of Texas
901 Leopard, Room 206
Corpus Christi, Texas 78401
(361) 888-0410
(361) 888-0399 (fax)

## CERTIFICATE OF SERVICE

This is to certify that a copy of this document was e-served on April 18, 2015, on Applicant's attorneys, Mr. Andrew M. Edison, Andrew.edison@emhllp.com, and Mr. James Chambers, james.chambers@emhllp.com.

/s/ *Douglas K. Norman*

_____
Douglas K. Norman

18

# APPENDIX  A



# APPENDIX B

## AFFIDAVIT

THE STATE OF TEXAS
COUNTY OF NUECES

BEFORE ME, the undersigned authority, on this day personally appeared John Mitchell, who after being by me duly sworn upon oath says:

My name is John Mitchell and I am a Deputy District Clerk for Nueces County and the Records Management Supervisor for the office. I am over 18 years of age, I have never been convicted of a crime, and I am fully competent to make this affidavit. I have personal knowledge of the facts stated herein, and they are all true and correct.

On April 17, 2015, I reviewed the attached photographs of a stool that had been admitted into evidence as SX#9 in the murder trial of Richard Vasquez, Cause No. 98-CR-0730-E, in the 148th District Court of Nueces County, Texas, and that I am presently holding as custodian of the evidence.

The attached photographs, with tape measure next to them, accurately show the height of the stool, which was measured to be approximately 10 &1/2 inches tall.

Further affiant saith naught.

_____
Affiant – John Mitchell

Subscribed and sworn to before me by the said John Mitchell this 17th day of April, 2015, to certify which witness my name and seal of office.

_____
Notary Public in and for the State of Texas

1



# APPENDIX C

# The American Journal of Forensic Medicine and Pathology

Volume 22　Number 1　March 2001

1　　**Fatal Pediatric Head Injuries Caused by Short-Distance Falls**
　　John Plunkett

13　　**Case Report of Sudden Death After a Blow to the Back of the Neck**
　　Gregory G. Davis and Jay M. Glass

19　　**Sudden Cardiac Death and Right Ventricular Dysplasia**
　　E. N. Michalodimitrakis, D. D.-A. Tsiftsis, A. M. Tsatsakis, and I. Stiakakis

23　　**Simultaneous Sudden Infant Death Syndrome: A Proposed Definition and Worldwide Review of Cases**
　　Steven A. Koehler, Shaun Ladham, Abdulrezzak Shakir, and Cyril H. Wecht

33　　**Simultaneous Sudden Infant Death Syndrome: A Case Report**
　　Shaun Ladham, Steven A. Koehler, Abdulrezzak Shakir, and Cyril H. Wecht

*(Continued)*

## Publication Staff

**Ruth Weinberg**
Senior Editor

**Susan Deitch**
Assistant Managing
Editor

**Anthony F. Trioli**
Account Manager

**Ray Thibodeau**
Director, Advertising
Sales

**Frances R. DeStefano**
Publisher

**Cynthia Payne**
Ad Production
Coordinator

**The Point of Difference**
International Advertising
Representative

*American Journal of Forensic Medicine and Pathology* (ISSN: 0195-7910) is published quarterly by Lippincott Williams & Wilkins, at 16522 Hunters Green Parkway, Hagerstown, MD 21740-2116. Business and production offices are located at 530 Walnut Street, Philadelphia, PA 19106-3621. Periodicals postage paid at Hagerstown, MD and at additional mailing offices. Copyright ©2001 by Lippincott Williams & Wilkins.

**Address for subscription information, orders, or change of address** (except Japan, India, Bangladesh, Sri Lanka, Nepal and Pakistan): 16522 Hunters Green Parkway, Hagerstown, MD 21740-2116; phone 1-800-638-3030; fax 301-223-2400; in Maryland, call collect 301-223-2300. In Japan, contact LWW Igaku-Shoin Ltd., 3-23-14 Hongo, Bunkyo-ku, Tokyo 113-0033, Japan; phone: 81-3-5689-5400; fax: 81-3-5689-5402. In India, Bangladesh, Sri Lanka, Nepal and Pakistan, contact Globe Publication Pvt. Ltd. B-13, 3rd FL, A Block, Shopping Complex, Naraina Vihar, Ring Road, New Delhi 110028, India; phone: 91-11-579-3211; fax: 91-11-579-8876.

**Annual subscription rates worldwide:** $231.00 Individual Domestic, $286.00 Individual International, $381.00 Institutional Domestic, $446.00 Institutional International, $118.00 Students/Residents Domestic, $144.00 Students/Residents International. (The Canadian GST tax of 7% will be added to the subscription price of all orders shipped to Canada. Lippincott Williams & Wilkins' GST Identification Number is 895524239. Publications Mail Agreement # 615919.) Subscriptions outside the United States must be prepaid. Subscriptions outside North America must add $4.00 for airfreight delivery. Prices subject to change without notice. Copies will be replaced without charge if the publisher receives a request within 90 days of the mailing date, both in the U.S. and worldwide. Visit us on-line at www.lww.com.

**Postmaster:** Send address changes to *American Journal of Forensic Medicine and Pathology*, P.O. Box 1550, Hagerstown, MD 21740.

Indexed in *Index Medicus/MEDLINE, Current Contents/Clinical Medicine, SCISEARCH, Excerpta Medica/EMBASE,* and *Biomedical Database,* and abstracted in *Criminology & Penology Abstracts* and *Police Science Abstracts.*

*The American Journal of Forensic Medicine and Pathology*    22(1):1–12, 2001.    ©2001 Lippincott Williams & Wilkins, Inc., Philadelphia

# Fatal Pediatric Head Injuries Caused by Short-Distance Falls

John Plunkett, M.D.

Physicians disagree on several issues regarding head injury in infants and children, including the potential lethality of a short-distance fall, a lucid interval in an ultimately fatal head injury, and the specificity of retinal hemorrhage for inflicted trauma. There is scant objective evidence to resolve these questions, and more information is needed. The objective of this study was to determine whether there are witnessed or investigated fatal short-distance falls that were concluded to be accidental. The author reviewed the January 1, 1988 through June 30, 1999 United States Consumer Product Safety Commission database for head injury associated with the use of playground equipment. The author obtained and reviewed the primary source data (hospital and emergency medical services' records, law enforcement reports, and coroner or medical examiner records) for all fatalities involving a fall.

The results revealed 18 fall-related head injury fatalities in the database. The youngest child was 12 months old, the oldest 13 years. The falls were from 0.6 to 3 meters (2–10 feet). A noncaretaker witnessed 12 of the 18, and 12 had a lucid interval. Four of the six children in whom funduscopic examination was documented in the medical record had bilateral retinal hemorrhage. The author concludes that an infant or child may suffer a fatal head injury from a fall of less than 3 meters (10 feet). The injury may be associated with a lucid interval and bilateral retinal hemorrhage.
**Key Words:** Child abuse—Head injury—Lucid interval—Retinal hemorrhage—Subdural hematoma.

Many physicians believe that a simple fall cannot cause serious injury or death (1–9), that a lucid interval does not exist in an ultimately fatal pediatric head injury (7–13), and that retinal hemorrhage is highly suggestive if not diagnostic for inflicted trauma (7,12,14–21). However, several have questioned these conclusions or urged caution when interpreting head injury in a child (15,22–28). This controversy exists because most infant injuries occur in the home (29,30), and if there is history of a fall, it is usually not witnessed or is seen only by the caretaker. Objective data are needed to resolve this dispute. It would be helpful if there were a database of fatal falls that were witnessed or wherein medical and law enforcement investigation unequivocally concluded that the death was an accident.

The United States Consumer Product Safety Commission (CPSC) National Injury Information Clearinghouse uses four computerized data sources (31). The National Electronic Injury Surveillance System (NEISS) file collects current injury data associated with 15,000 categories of consumer products from 101 U.S. hospital emergency departments, including 9 pediatric hospitals. The file is a probability sample and is used to estimate the number and types of consumer product–related injuries each year (32). The Death Certificate (DC) file is a demographic summary created by information provided to the CPSC by selected U.S. State Health Departments. The Injury/Potential Injury Incident (IR) file contains summaries, indexed by consumer product, of reports to the CPSC from consumers, medical examiners and coroners (Medical Examiner and Coroner Alert Project [MECAP]), and newspaper accounts of product-related incidents discovered by local or regional CPSC staff (33). The In-Depth Investigations (AI) file contains summaries of investigations performed by CPSC staff based on reports received from the NEISS, DC, or IR files (34). The AI files provide details about the incident from victim and witness interviews, accident reconstruction, and review of law enforce-

Manuscript received April 10, 2000; revised September 15, 2000; accepted September 24, 2000.

From the Departments of Pathology and Medical Education, Regina Medical Center, 1175 Nininger Road, Hastings MN 55033, U.S.A.; Email: plunkettj@reginamedical.com.

ment, health care facility, and coroner or medical examiner records (if a death occurred).

## METHODS

I reviewed the CPSC, DC, IR, and AI files for all head and neck injuries involving playground equipment recorded by the CPSC from January 1, 1988 through June 30, 1999. There are 323 entries in the playground equipment IR file, 262 in the AI file, 47 in the DC file, and more than 75,000 in the NEISS file. All deaths in the NEISS file generated an IR or AI file. If the file indicated that a death had occurred from a fall, I obtained and reviewed each original source record from law enforcement, hospitals, emergency medical services (EMS), and coroner or medical examiner offices except for one autopsy report. However, I discussed the autopsy findings with the pathologist in this case.

## RESULTS

There are 114 deaths in the Clearinghouse database, 18 of which were due to head injury from a fall. The following deaths were excluded from this study: those that involved equipment that broke or collapsed, striking a person on the head or neck (41); those in which a person became entangled in the equipment and suffocated or was strangled (45), those that involved equipment or incidents other than playground (6 [including a 13.7-meter fall from a homemade Ferris wheel and a 3-meter fall from a cyclone fence adjacent to a playground]); and falls in which the death was caused exclusively by neck (carotid vessel, airway, or cervical spinal cord) injury (4). The falls were from horizontal ladders (4), swings (7), stationary platforms (3), a ladder attached to a slide, a "see-saw", a slide, and a retaining wall. Thirteen occurred on a school or public playground, and five occurred at home. The database is not limited to infants and children, but a 13-year-old was the oldest fatality (range; 12 months–13 years; mean, 5.2 years; median, 4.5 years). The distance of the fall, defined as the distance of the closest body part from the ground at the beginning of the fall, could be determined from CPSC or law enforcement reconstruction and actual measurement in 10 cases and was 0.6 to 3.0 meters (mean, 1.3 ± 0.77; median, 0.9). The distance could not be accurately determined in the seven fatalities involving swings and one of the falls from a horizontal ladder, and may have been from as little as 0.6 meters to as much as 2.4 meters. The maximum height for a fall from a swing was assumed to

be the highest point of the arc. Twelve of the 18 falls were witnessed by a noncaretaker or were videotaped; 12 of the children had a lucid interval (5 minutes–48 hours); and 4 of the 6 in whom funduscopic examination was performed had bilateral retinal hemorrhage (Table 1).

## CASES

### Case 1

This 12-month-old was seated on a porch swing between her mother and father when the chain on her mother's side broke and all three fell sideways and backwards 1.5 to 1.8 meters (5–6 feet) onto decorative rocks in front of the porch. The mother fell first, then the child, then her father. It is not known if her father landed on top of her or if she struck only the ground. She was unconscious immediately. EMS was called; she was taken to a local hospital; and was ictal and had decerebrate posturing in the emergency room. She was intubated, hyperventilated, and treated with mannitol. A computed tomography (CT) scan indicated a subgaleal hematoma at the vertex of the skull, a comminuted fracture of the vault, parafalcine subdural hemorrhage, and right parietal subarachnoid hemorrhage. There was also acute cerebral edema with effacement of the right frontal horn and compression of the basal cisterns. She had a cardiopulmonary arrest while the CT scan was being done and could not be resuscitated.

### Case 2

A 14-month-old was on a backyard "see-saw" and was being held in place by his grandmother. The grandmother said that she was distracted for a moment and he fell backward, striking the grass-covered ground 0.6 meters (22.5 inches) below the plastic seat. He was conscious but crying, and she carried him into the house. Within 10 to 15 minutes he became lethargic and limp, vomited, and was taken to the local hospital by EMS personnel. He was unconscious but purposefully moving all extremities when evaluated, and results of funduscopic examination were normal. A CT scan indicated an occipital subgaleal hematoma, left-sided cerebral edema with complete obliteration of the left frontal horn, and small punctate hemorrhages in the left frontal lobe. There was no fracture or subdural hematoma. He was treated with mannitol; his level of consciousness rapidly improved; and he was extubated. However, approximately 7 hours after admission he began to have difficulty breathing, both pupils suddenly dilated, and he was rein-

**TABLE 1.** *Summary of cases*

| No. | CPSC No. | Age | Sex | Fall from | Distance M/F | Witnessed | Lucid interval | Retinal hemorrhage | Subdural hemorrhage | Autopsy | Cause of death | FP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | DC 9108013330 | 12 mos | F | Swing | 1.5–1.8/5.0–6.0 | No | No | N/R | Yes +IHF | No | Complex calvarial fracture with edema and contusions | No |
| 2 | AI 890208HBC3088 | 14 mos | M | See-saw | 0.6/2.0 | No | 10–15 minutes | No | No | No | Malignant cerebral edema with herniation | No |
| 3 | IR F910368A | 17 mos | F | Swing | 1.5–1.8/5.0–6.0 | No | No | N/R | Yes +IHF | Yes | Acute subdural hematoma with secondary cerebral edema | Yes |
| 4 | AI 921001HCC2263 | 20 mos | F | Platform | 1.1/3.5 | No | 5–10 minutes | Bilateral multilayered | Yes +IHF | Limited | Occipital fracture with subdural/subarachnoid hemorrhage progressing to cerebral edema and herniation | Yes |
| 5[a] | DC 9312060661 | 23 mos | F | Platform | 0.70/2.3 | Yes | 10 minutes | Bilateral, NOS | Yes | Yes | Acute subdural hematoma | Yes |
| 6 | DC 9451016513 | 26 mos | M | Swing | 0.9–1.8/3.0–6.0 | Yes | No | Bilateral multilayered | Yes +IHF | Yes | Subdural hematoma with associated cerebral edema | Yes |
| 7[a] | AI 891215HcC2094 | 3 yrs | M | Platform | 0.9/3.0 | Yes | 10 minutes | N/R | Yes | No | Acute cerebral edema with herniation | No |
| 8 | AI 910515HCC2182 | 3 yrs | F | Ladder | 0.6/2.0 | yes | 15 minutes | N/R | Yes (autopsy only) | Yes | Complex calvarial fracture, contusions, cerebral edema with herniation | Yes |
| 9 | DC 9253024577 | 4 yrs | M | Slide | 2.1/7.0 | Yes | 3 hours | N/R | No | Yes | Epidural hematoma | Yes |
| 10 | AI 920710HWE4014 | 5 yrs | M | Horizontal ladder | 2.1/7.0 | No | No | N/R | Yes | No | Acute subdural hematoma with acute cerebral edema | Yes |
| 11 | AI 960517HCC5175 | 6 yrs | M | Swing | 0.6–2.4/2.0–8.0 | No | 10 minutes | No | Yes +IHF | No | Acute subdural hematoma | Yes |
| 12 | AI 970324HCC3040 | 6 yrs | M | Horizontal ladder | 3.0/10.0 | Yes | 45 minutes | N/R | No | No | Malignant cerebral edema with herniation | Yes |
| 13 | AI 881229HCC3070 | 6 yrs | F | Horizontal ladder | 0.9/3.0 | Yes | 1+ hour | N/R | Yes +IHF | Yes | Subdural and subarachnoid hemorrhage, cerebral infarct, and edema | Yes |
| 14 | AI 930930HWE5025 | 7 yrs | M | Horizontal ladder | 1.2–2.4/4.0–8.0 | Yes | 48 hours | N/R | No | Yes | Cerebral infarct secondary to carotid/vertebral artery thrombosis | Yes |
| 15 | AI 970409HCC1096 | 8 yrs | F | Retaining wall | 0.9/3.0 | Yes | 12+ hours | N/R | Yes (autopsy only) | Yes | Acute subdural hematoma | Yes |
| 16 | AI 890621HCC3195 | 10 yrs | M | Swing | 0.9–1.5/3.0–5.0 | Yes | 10 minutes | Bilateral multilayered | Yes | Yes | Acute subdural hematoma contiguous with an AV malformation | No |
| 17 | AI 920428HCC1671 | 12 yrs | F | Swing | 0.9–1.8/3.0–6.0 | Yes | No | N/R | No | Yes | Occipital fracture with extensive contra-coup contusions | Yes |
| 18 | AI 891016HCC1511 | 13 yrs | F | Swing | 0.6–1.8/2.0–6.0 | Yes | No | N/R | Yes +IHF | Yes | Occipital fracture, subdural hemorrhage, cerebral edema | Yes |

[a]The original CT scan for case #7 and the soft tissue CT windows for case #5 could not be located and were unavailable for review.

CPSC, Consumer Products Safety Commission; AI, accident investigation; IR, incident report; DC, death certificate; M, male; F, female; Distance, the distance of the closest body part from the ground at the start of the fall (see text); M/F, meters/feet; Witnessed, witnessed by a noncaretaker or videotaped; N/R, not recorded; IHF, including interhemispheric or falx; FP, forensic pathologist–directed death investigation system.

tubated. A second CT scan demonstrated progression of the left hemispheric edema despite medical management, and he was removed from life support 22 hours after admission.

### Case 3

This 17-month-old had been placed in a baby carrier–type swing attached to an overhead tree limb at a daycare provider's home. A restraining bar held in place by a snap was across her waist. She was being pushed by the daycare provider to an estimated height of 1.5 to 1.8 meters (5–6 feet) when the snap came loose. The child fell from the swing on its downstroke, striking her back and head on the grassy surface. She was immediately unconscious and apneic but then started to breathe spontaneously. EMS took her to a pediatric hospital. A CT scan indicated a large left-sided subdural hematoma with extension to the interhemispheric fissure anteriorly and throughout the length of the falx. The hematoma was surgically evacuated, but she developed malignant cerebral edema and died the following day. A postmortem examination indicated symmetrical contusions on the buttock and midline posterior thorax, consistent with impact against a flat surface; a small residual left-sided subdural hematoma; cerebral edema with anoxic encephalopathy; and uncal and cerebellar tonsillar herniation. There were no cortical contusions.

### Case 4

A 20-month-old was with other family members for a reunion at a public park. She was on the platform portion of a jungle gym when she fell from the side and struck her head on one of the support posts. The platform was 1.7 meters (67 inches) above the ground and 1.1 meters (42 inches) above the top of the support post that she struck. Only her father saw the actual fall, although there were a number of other people in the immediate area. She was initially conscious and talking, but within 5 to 10 minutes became comatose. She was taken to a nearby hospital, then transferred to a tertiary-care facility. A CT scan indicated a right occipital skull fracture with approximately 4-mm of depression and subarachnoid and subdural hemorrhage along the tentorium and posterior falx. Funduscopic examination indicated extensive bilateral retinal and preretinal hemorrhage. She died 2 days later because of uncontrollable increased intracranial pressure. A limited postmortem examination indicated an impact subgaleal hematoma overlying the fracture in the mid occiput.

### Case 5

A 23-month-old was playing on a plastic gym set in the garage at her home with her older brother. She had climbed the attached ladder to the top rail above the platform and was straddling the rail, with her feet 0.70 meters (28 inches) above the floor. She lost her balance and fell headfirst onto a 1-cm (⅜-inch) thick piece of plush carpet remnant covering the concrete floor. She struck the carpet first with her outstretched hands, then with the right front side of her forehead, followed by her right shoulder. Her grandmother had been watching the children play and videotaped the fall. She cried after the fall but was alert and talking. Her grandmother walked/carried her into the kitchen, where her mother gave her a baby analgesic with some water, which she drank. However, approximately 5 minutes later she vomited and became stuporous. EMS personnel airlifted her to a tertiary-care university hospital. A CT scan indicated a large right-sided subdural hematoma with effacement of the right lateral ventricle and minimal subfalcine herniation. (The soft tissue windows for the scan could not be located and were unavailable for review.) The hematoma was immediately evacuated. She remained comatose postoperatively, developed cerebral edema with herniation, and was removed from life support 36 hours after the fall. Bilateral retinal hemorrhage, not further described, was documented in a funduscopic examination performed 24 hours after admission. A postmortem examination confirmed the right frontal scalp impact injury. There was a small residual right subdural hematoma, a right parietal lobe contusion (secondary to the surgical intervention), and cerebral edema with cerebellar tonsillar herniation.

### Case 6

A 26-month-old was on a playground swing being pushed by a 13-year-old cousin when he fell backward 0.9 to 1.8 meters (3–6 feet), striking his head on hard-packed soil. The 13-year-old and several other children saw the fall. He was immediately unconscious and was taken to a local emergency room, then transferred to a pediatric hospital. A CT scan indicated acute cerebral edema and a small subdural hematoma adjacent to the anterior interhemispheric falx. A funduscopic examination performed 4 hours after admission indicated extensive bilateral retinal hemorrhage, vitreous hemorrhage in the left eye, and papilledema. He had a subsequent cardiopulmonary arrest and could not be resuscitated. A postmortem examination confirmed the retinal hemorrhage and indicated a right parietal scalp impact injury but no calvarial frac-

ture, a "film" of bilateral subdural hemorrhage, cerebral edema with herniation, and focal hemorrhage in the right posterior midbrain and pons.

## Case 7

This 3-year-old with a history of TAR (thrombocytopenia–absent radius) syndrome was playing with other children on playground equipment at his school when he stepped through an opening in a platform. He fell 0.9 meters (3 feet) to the hard-packed ground, striking his face. A teacher witnessed the incident. He was initially conscious and able to walk. However, approximately 10 minutes later he had projectile vomiting and became comatose, was taken to a local hospital, and subsequently transferred to a pediatric hospital. A CT scan indicated a small subdural hematoma and diffuse cerebral edema with uncal herniation, according to the admission history and physical examination. (The original CT report and scan could not be located and were unavailable for review.) His platelet count was 24,000/mm³, and he was treated empirically with platelet transfusions, although he had no evidence for an expanding extra-axial mass. Resuscitation was discontinued in the emergency room.

## Case 8

This 3-year-old was at a city park with an adult neighbor and four other children, ages 6 to 10. She was standing on the third step of a slide ladder 0.6 meters (22 inches) above the ground when she fell forward onto compact dirt, striking her head. The other children but not the adult saw the fall. She was crying but did not appear to be seriously injured, and the neighbor picked her up and brought her to her parents' home. Approximately 15 minutes later she began to vomit, and her mother called EMS. She was taken to a local emergency room, then transferred to a pediatric hospital. She was initially lethargic but responded to hyperventilation and mannitol; she began to open her eyes with stimulation and to spontaneously move all extremities and was extubated. However, she developed malignant cerebral edema on the second hospital day and was reintubated and hyperventilated but died the following day. A postmortem examination indicated a subgaleal hematoma at the vertex of the skull associated with a complex fracture involving the left frontal bone and bilateral temporal bones. There were small epidural and subdural hematomas (not identifiable on the CT scan), bilateral "contra-coup" contusions of the inferior surfaces of the frontal and temporal lobes, and marked cerebral edema with uncal herniation.

## Case 9

A 4-year-old fell approximately 2.1 meters (7 feet) from a playground slide at a state park, landing on the dirt ground on his buttock, then falling to his left side, striking his head. There was no loss of consciousness, but his family took him to a local emergency facility, where an evaluation was normal. However, he began vomiting and complained of left neck and head pain approximately 3 hours later. He was taken to a second hospital, where a CT scan indicated a large left parietal epidural hematoma with a midline shift. He was transferred to a pediatric hospital and the hematoma was evacuated, but he developed malignant cerebral edema with right occipital and left parietal infarcts and was removed from the respirator 10 days later. A postmortem examination indicated a small residual epidural hematoma, marked cerebral edema, bilateral cerebellar tonsillar and uncal herniation, and hypoxic encephalopathy. There was no identifiable skull fracture.

## Case 10

A 5-year-old was apparently walking across the horizontal ladder of a "monkey bar," part of an interconnecting system of homemade playground equipment in his front yard, when his mother looked out one of the windows and saw him laying face down on the ground and not moving. The horizontal ladder was 2.1 meters (7 feet) above compacted dirt. EMS were called, he was taken to a local hospital, and then transferred to a pediatric hospital. A CT scan indicated a right posterior temporal linear fracture with a small underlying epidural hematoma, a 5-mm thick acute subdural hematoma along the right temporal and parietal lobes, and marked right-sided edema with a 10-mm midline shift. He was hyperventilated and treated with mannitol, but the hematoma continued to enlarge and was surgically evacuated. However, he developed uncontrollable cerebral edema and was removed from life support 10 days after the fall.

## Case 11

A 6-year-old was on a playground swing at a private lodge with his 14-year-old sister. His sister heard a "thump," turned around, and saw him on the grass-covered packed earth beneath the swing. The actual fall was not witnessed. The seat of the swing was 0.6 meters (2 feet) above the ground, and the fall distance could have been from as high as 2.4 meters (8 feet). He was initially conscious and talking but within 10 minutes became comatose and was taken to a local emergency room, then transferred to a tertiary-care hospital. A CT

scan indicated a large left frontoparietal subdural hematoma with extension into the anterior interhemispheric fissure and a significant midline shift with obliteration of the left lateral ventricle. There were no retinal hemorrhages. He was treated aggressively with dexamethasone and hyperventilation, but there was no surgical intervention. He died the following day.

### Case 12

This 6-year-old was at school and was sitting on the top crossbar of a "monkey bar" approximately 3 meters (10 feet) above compacted clay soil when an unrelated noncaretaker adult saw him fall from the crossbar to the ground. He landed flat on his back and initially appeared to have the wind knocked out of him but was conscious and alert. He was taken to the school nurse who applied an ice pack to a contusion on the back of his head. He rested for approximately 30 minutes in the nurse's office and was being escorted back to class when he suddenly collapsed. EMS was called, and he was transported to a pediatric hospital. He was comatose on admission, the fundi could not be visualized, and a head CT scan was interpreted as normal. However, a CT scan performed the following morning approximately 20 hours after the fall indicated diffuse cerebral edema with effacement of the basilar cisterns and fourth ventricle. There was no identifiable subdural hemorrhage or calvarial fracture. He developed transtentorial herniation and died 48 hours after the fall.

### Case 13

This 6-year-old was playing on a school playground with a 5th grade student/friend. She was hand-over-hand traversing the crossbar of a "monkey bar" 2.4 meters (7 feet 10 inches) above the ground with her feet approximately 1 meter (40 inches) above the surface. She attempted to slide down the pole when she reached the end of the crossbar but lost her grip and slid quickly to the ground, striking the compacted dirt first with her feet, then her buttock and back, and finally her head. The friend informed the school principal of the incident, but the child seemed fine and there was no intervention. She went to a relative's home for after-school care approximately 30 minutes after the fall, watched TV for a while, then complained of a headache and laid down for a nap. When her parents arrived at the home later that evening, 6 hours after the incident, they discovered that she was incoherent and "drooling." EMS transported her to a tertiary-care medical center. A CT scan indicated a right parieto-occipital skull frac-

ture, subdural and subarachnoid hemorrhage, and a right cerebral hemisphere infarct. The infarct included the posterior cerebral territory and was thought most consistent with thrombosis or dissection of a right carotid artery that had a persistent fetal origin of the posterior cerebral artery. She remained comatose and was removed from the respirator 6 days after admission. A postmortem examination indicated superficial abrasions and contusions over the scapula, a prominent right parietotemporal subgaleal hematoma, and a right parietal skull fracture. She had a 50-ml subdural hematoma and cerebral edema with global hypoxic or ischemic injury ("respirator brain"), but the carotid vessels were normal.

### Case 14

A 7-year-old was on the playground during school hours playing on the horizontal ladder of a "monkey bar" when he slipped and fell 1.2 to 2.4 meters (4–8 feet). According to one witness, he struck his forehead on the bars of the vertical ladder; according to another eyewitness he struck the rubber pad covering of the asphalt ground. There are conflicting stories as to whether he had an initial loss of consciousness. However, he walked back to the school, and EMS was called because of the history of the fall. He was taken to a local hospital, where evaluation indicated a Glasgow coma score of 15 and a normal CT scan except for an occipital subgaleal hematoma. He was kept overnight for observation because of the possible loss of consciousness but was released the following day. He was doing homework at home 2 days after the fall when his grandmother noticed that he was stumbling and had slurred speech, and she took him back to the hospital. A second CT scan indicated a left carotid artery occlusion and left temporal and parietal lobe infarcts. The infarcts and subsequent edema progressed; he had brainstem herniation; and he was removed from life support 3 days later (5 days after the initial fall). A postmortem examination indicated ischemic infarcts of the left parietal, temporal, and occipital lobes, acute cerebral edema with herniation, and thrombosis of the left vertebral artery. Occlusion of the carotid artery, suspected premortem, could not be confirmed.

### Case 15

This 8-year-old was at a public playground near her home with several friends her age. She was hanging by her hands from the horizontal ladder of a "monkey bar" with her feet approximately 1.1 meters (3.5 feet) above the ground when she attempted to swing from the bars to a nearby 0.9-

meter (34-inch) retaining wall. She landed on the top of the wall but then lost her balance and fell to the ground, either to a hard-packed surface (one witness) or to a 5.1-cm (2-inch) thick resilient rubber mat (a second witness), striking her back and head. She initially cried and complained of a headache but continued playing, then later went home. Her mother said that she seemed normal and went to bed at her usual time. However, when her mother tried to awaken her at approximately 8:30 the following morning (12 hours after the fall) she complained of a headache and went back to sleep. She awoke at 11 a.m. and complained of a severe headache then became unresponsive and had a seizure. EMS took her to a nearby hospital, but she died in the emergency room. A postmortem examination indicated a right temporoparietal subdural hematoma, extending to the base of the brain in the middle and posterior fossae, with flattening of the gyri and narrowing of the sulci. (The presence or absence of herniation is not described in the autopsy report.) There was no calvarial fracture, and there was no identifiable injury in the scalp or galea.

## Case 16

A 10-year-old was swinging on a swing at his school's playground during recess when the seat detached from the chain and he fell 0.9 to 1.5 meters (3–5 feet) to the asphalt surface, striking the back of his head. The other students but not the three adult playground supervisors saw him fall. He remained conscious although groggy and was carried to the school nurse's office, where an ice pack was placed on an occipital contusion. He suddenly lost consciousness approximately 10 minutes later, and EMS took him to a local hospital. He had decerebrate posturing when initially evaluated. Funduscopic examination indicated extensive bilateral confluent and stellate, posterior and peripheral preretinal and subhyaloid hemorrhage. A CT scan showed a large acute right frontoparietal subdural hematoma with transtentorial herniation. The hematoma was surgically removed, but he developed malignant cerebral edema and died 6 days later. A postmortem examination indicated a right parietal subarachnoid AV malformation, contiguous with a small amount of residual subdural hemorrhage, and cerebral edema with anoxic encephalopathy and herniation. There was no calvarial fracture.

## Case 17

A 12-year-old was at a public playground with a sister and another friend and was standing on the seat of a swing when the swing began to twist. She lost her balance and fell 0.9 to 1.8 meters (3–6 feet) to the asphalt surface, striking her posterior thorax and occipital scalp. She was immediately unconscious and was taken to a tertiary-care hospital emergency room, where she was pronounced dead. A postmortem examination indicated an occipital impact injury associated with an extensive comminuted occipital fracture extending into both middle cranial fossa and "contra-coup" contusions of both inferior frontal and temporal lobes.

## Case 18

This 13-year-old was at a public playground with a friend. She was standing on the seat of a swing with her friend seated between her legs when she lost her grip and fell backwards 0.6 to 1.8 meters (2–6 feet), striking either a concrete retaining wall adjacent to the playground or a resilient 5.1-cm (2 inch) thick rubber mat covering the ground. She was immediately unconscious and was given emergency first aid by a physician who was nearby when the fall occurred. She was taken to a nearby hospital and was purposefully moving all extremities and had reactive pupils when initially evaluated. A CT scan indicated interhemispheric subdural hemorrhage and generalized cerebral edema, which progressed rapidly to brain death. A postmortem examination indicated a linear nondepressed midline occipital skull fracture, subdural hemorrhage extending to the occiput, contusion of the left cerebellar hemisphere, bifrontal "contracoup" contusions, and cerebral edema.

## DISCUSSION

### General

Traumatic brain injury (TBI) is caused by a force resulting in either strain (deformation/unit length) or stress (force/original cross-sectional area) of the scalp, skull, and brain (35–37). The extent of injury depends not only on the level and duration of force but also on the specific mechanical and geometric properties of the cranial system under loading (38–40). Different parts of the skull and brain have distinct biophysical characteristics, and calculating deformation and stress is complex. However, an applied force causes the skull and brain to move, and acceleration, the time required to reach peak acceleration, and the duration of acceleration may be measured at specific locations (36,41). These kinematic parameters do not cause the actual brain damage but are useful for analyzing TBI because they are easy to quantify. Research in TBI using physical models and animal experiments has shown that a force resulting in angular acceleration pro-

duces primarily diffuse brain damage, whereas a force causing exclusively translational acceleration produces only focal brain damage (36). A fall from a countertop or table is often considered to be exclusively translational and therefore assumed incapable of producing serious injury (3,7–9). However, sudden impact deceleration *must* have an angular vector unless the force is applied only through the center of mass (COM), and deformation of the skull during impact *must* be accompanied by a volume change (cavitation) in the subdural "space" tangential to the applied force (41). The angular and deformation factors produce tensile strains on the surface veins and mechanical distortions of the brain during impact and may cause a subdural hematoma without deep white matter injury or even unconsciousness (42–44).

Many authors state that a fall from less than 3 meters (10 feet) is rarely if ever fatal, especially if the distance is less than 1.5 meters (5 feet) (1–6,8,9). The few studies concluding that a short-distance fall may be fatal (22–24,26,27) have been criticized because the fall was not witnessed or was seen only by the caretaker. However, isolated reports of observed fatal falls and biomechanical analysis using experimental animals, adult human volunteers, and models indicate the potential for serious head injury or death from as little as a 0.6-meter (2-foot) fall (48–52). There are limited experimental studies on infants (cadaver skull fracture) (53,54) and none on living subadult nonhuman primates, but the adult data have been extrapolated to youngsters and used to develop the Hybrid II/III and Child Restraint–Air Bag Interaction (CRABI) models (55) and to propose standards for playground equipment (56,63). We simply do not know either kinematic or nonkinematic limits in the pediatric population (57,58).

Each of the falls in this study exceeded established adult kinematic thresholds for traumatic brain injury (41,48–52). Casual analysis of the falls suggests that most were primarily translational. However, deformation and *internal* angular acceleration of the skull and brain *caused by the impact* produce the injury. What happens during the impact, not during the fall, determines the outcome.

## Subdural Hemorrhage

A "high strain" impact (short pulse duration and high rate for deceleration onset) typical for a fall is more likely to cause subdural hemorrhage than a "low strain" impact (long pulse duration and low rate for deceleration onset) that is typical of a motor vehicle accident (42,61). The duration of deceleration for a head-impact fall against a nonyielding surface is usually less than 5 milliseconds (39,59–61). Experimentally, impact duration longer than 5 milliseconds will not cause a subdural hematoma unless the level of angular acceleration is above $1.75 \times 10^5$ rad/s$^2$ (61). A body in motion with an angular acceleration of $1.75 \times 10^5$ rad/s$^2$ has a tangential acceleration of 17,500 m/s$^2$ at 0.1 meters (the distance from the midneck axis of rotation to the midbrain COM in the Duhaime model). A human cannot produce this level of acceleration by impulse ("shake") loading (62).

An injury resulting in a subdural hematoma in an infant may be caused by an accidental fall (43,44,64). A recent report documented the findings in seven children seen in a pediatric hospital emergency room after an accidental fall of 0.6 to 1.5 meters who had subdural hemorrhage, no loss of consciousness, and no symptoms (44). The characteristics of the hemorrhage, especially extension into the posterior interhemispheric fissure, have been used to suggest if not confirm that the injury was nonaccidental (9,62,65–68). The hemorrhage extended into the posterior interhemispheric fissure in 5 of the 10 children in this study (in whom the blood was identifiable on CT or magnetic resonance scans and the scans were available for review) and along the anterior falx or anterior interhemispheric fissure in an additional 2 of the 10.

## Lucid Interval

Disruption of the diencephalic and midbrain portions of the reticular activating system (RAS) causes unconsciousness (36,69,70). "Shearing" or "diffuse axonal" injury (DAI) is thought to be the primary biophysical mechanism for immediate traumatic unconsciousness (36,71). Axonal injury has been confirmed at autopsy in persons who had a brief loss of consciousness after a head injury and who later died from other causes, such as coronary artery disease (72). However, if unconsciousness is momentary or brief ("concussion") subsequent deterioration *must* be due to a mechanism other than DAI. Apnea and catecholamine release have been suggested as significant factors in the outcome following head injury (73,74). In addition, the centripetal theory of traumatic unconsciousness states that primary disruption of the RAS will not occur in isolation and that structural brainstem damage from inertial (impulse) or impact (contact) loading *must* be accompanied by evidence for cortical and subcortical damage (36). This theory has been validated by magnetic resonance imaging and CT scans in adults and children (75,76). Only one of the children in this study (case 6) had evidence for any component of DAI. This child had focal hemor-

NO POSTAGE

rhage in the posterior midbrain and pons, thought by the pathologist to be primary, although there was no skull fracture, only "a film" of subdural hemorrhage, no tears in the corpus callosum, and no lacerations of the cerebral white matter (grossly or microscopically).

The usual cause for delayed deterioration in infants and children is cerebral edema, whereas in adults it is an expanding extra-axial hematoma (77). If the mechanism for delayed deterioration (except for an expanding extra-axial mass) is venospasm, cerebral edema may be the only morphologic marker. The "talk and die or deteriorate (TADD)" syndrome is well characterized in adults (78). Two reports in the pediatric literature discuss TADD, documenting 4 fatalities among 105 children who had a lucid interval after head injury and subsequently deteriorated (77,79). Many physicians believe that a lucid interval in an ultimately fatal pediatric head injury is extremely unlikely or does not occur unless there is an epidural hematoma (7,8,11). Twelve children in this study had a lucid interval. A noncaretaker witnessed 9 of these 12 falls. One child had an epidural hematoma.

### Retinal Hemorrhage

The majority of published studies conclude that retinal hemorrhage, especially if bilateral and posterior or associated with retinoschisis, is highly suggestive of, if not diagnostic for, nonaccidental injury (9,14–21). Rarely, retinal hemorrhage has been associated with an accidental head injury, but in these cases the bleeding was unilateral (80). It is also stated that traumatic retinal hemorrhage may be the direct mechanical effect of violent shaking (15). However, retinal hemorrhage may be caused experimentally either by ligating the central retinal vein or its tributaries or by suddenly increasing intracranial pressure (81,82); retinoschisis is the result of breakthrough bleeding and venous stasis not "violent shaking" (15,83). Any sudden increase in intracranial pressure may cause retinal hemorrhage (84–87). Deformation of the skull coincident to an impact nonselectively increases intracranial pressure. Venospasm secondary to traumatic brain injury selectively increases venous pressure. Either mechanism may cause retinal hemorrhage irrespective of whether the trauma was accidental or inflicted. Further, retinal and optic nerve sheath hemorrhages associated with a ruptured vascular malformation are due to an increase in venous pressure not extension of blood along extravascular spaces (81–83,88). Dilated eye examination with an indirect ophthalmoscope is thought to be more sensitive for detecting retinal bleeding than routine examination and has been recommended as part of the evaluation of any pediatric patient with head trauma (89). None of the children in this study had a formal retinal evaluation, and only six had funduscopic examination documented in the medical record. Four of the six had bilateral retinal hemorrhage.

### Pre-existing Conditions

One of these children (case 16) had a subarachnoid AV malformation that contributed to development of the subdural hematoma, causing his death. One (case 7) had TAR syndrome (90), but his death was thought to be caused by malignant cerebral edema not an expanding extra-axial mass.

### Cerebrovascular Thrombosis

Thrombosis or dissection of carotid or vertebral arteries as a cause of delayed deterioration after head or neck injuries is documented in both adults and children (91,92). Case 14 is the first report of a death due to traumatic cerebrovascular thrombosis in an infant or child. Internal carotid artery thrombosis was suggested radiographically in an additional death (case 13) but could not be confirmed at autopsy. However, this child died 6 days after admission to the hospital, and fibrinolysis may have removed any evidence for thrombosis at the time the autopsy was performed.

### Limitations

1. Six of the 18 falls were not witnessed or were seen only by the adult caretaker, and it is possible that another person caused the nonobserved injuries.
2. The exact height of the fall could be determined in only 10 cases. The others (7 swing and 1 stationary platform) could have been from as little as 0.6 meters (2 feet) to as much as 2.4 meters (8 feet).
3. A minimum impact velocity sufficient to cause fatal brain injury cannot be inferred from this study. Likewise, the probability that an individual fall will have a fatal outcome cannot be stated because the database depends on voluntary reporting and contractual agreements with selected U.S. state agencies. The NEISS summaries for the study years estimated that there were more than 250 deaths due to head and neck injuries associated with playground equipment, but there are only 114 in the files. Further, this study does not include other nonplayground equipment–related fatal falls, witnessed or not witnessed, in the CPSC database (32).

## CONCLUSIONS

1. Every fall is a complex event. There must be a biomechanical analysis for any incident in which the severity of the injury appears to be inconsistent with the history. The question is not "Can an infant or child be seriously injured or killed from a short-distance fall?" but rather "If a child falls (x) meters and strikes his or her head on a nonyielding surface, what will happen?"

2. Retinal hemorrhage may occur whenever intracranial pressure exceeds venous pressure or whenever there is venous obstruction. The characteristic of the bleeding cannot be used to determine the ultimate cause.

3. Axonal damage is unlikely to be the mechanism for lethal injury in a low-velocity impact such as from a fall.

4. Cerebrovascular thrombosis or dissection must be considered in any injury with apparent delayed deterioration, and especially in one with a cerebral infarct or an unusual distribution for cerebral edema.

5. A fall from less than 3 meters (10 feet) in an infant or child may cause fatal head injury and may not cause immediate symptoms. The injury may be associated with bilateral retinal hemorrhage, and an associated subdural hematoma may extend into the interhemispheric fissure. A history by the caretaker that the child may have fallen cannot be dismissed.

**Acknowledgements:** The author thanks the law enforcement, emergency medical services, and medical professionals who willingly helped him obtain the original source records and investigations; Ida Harper-Brown (Technical Information Specialist) and Jean Kennedy (Senior Compliance Officer) from the U.S. CPSC, whose enthusiastic assistance made this study possible; Ayub K. Ommaya, M.D., and Werner Goldsmith, Ph.D., for critically reviewing the manuscript; Jan E. Leestma, M.D., and Faris A. Bandak, Ph.D., for helpful comments; Mark E. Myers, M.D., and Michael B. Plunkett, M.D., for review of the medical imaging studies; Jeanne Reuter and Kathy Goranowski, for patience, humor, and completing the manuscript; and all the families who shared the stories of their sons and daughters and for whom this work is dedicated.

## APPENDIX

Newtonian mechanics involving constant acceleration may be used to determine the impact velocity in a gravitational fall. However, constant acceleration formulas cannot be used to calculate the relations among velocity, acceleration, and distance traveled *during* an impact because the deceleration is not uniform (45). This analysis requires awareness of the shape of the deceleration curve, knowledge of the mechanical properties and geometry of the cranial system, and comprehension of the stress and strain characteristics for the specific part of the skull and brain that strikes the ground. A purely translational fall requires that the body is rigid and that the external forces acting on the body pass only through the COM, i.e., there is no rotational component. A 1-meter-tall 3-year-old hanging by her knees from a horizontal ladder with the vertex of her skull 0.5 meters above hard-packed earth approximates this model. If she looses her grip and falls, striking the occipital scalp, her impact velocity is 3.1 m/second. An exclusively angular fall also requires that the body is rigid. In addition, the rotation must be about a fixed axis or a given point internal or external to the body, and the applied moment and the inertial moment must be at the identical point or axis. If this same child has a 0.5-meter COM and has a "matchstick" fall while standing on the ground, again striking her occiput, her angular velocity is 5.42 rad/second and tangential velocity 5.42 m/second at impact. The impact velocity is higher than predicted for an exclusively translational or external-axis angular fall when the applied moment and the inertial moment are at a different fixed point (slip and fall) or when the initial velocity is not zero (walking or running, then trip and fall), and the vectors are additive. However, the head, neck, limbs, and torso do not move uniformly during a fall because relative motion occurs with different velocities and accelerations for each component. Calculation of the impact velocity for an actual fall requires solutions of differential equations for each simultaneous translational and rotational motion (45). Further, inertial or impulse loading (whiplash) may cause head acceleration more than twice that of the midbody input force and may be important in a fall where the initial impact is to the feet, buttock, back, or shoulder, and the final impact is to the head (46,47).

The translational motion of a rigid body at constant gravitational acceleration (9.8 m/s$^2$) is calculated from:

$$F = ma \qquad v^2 = 2as \qquad v = at$$

where F = the sum of all forces acting on the body (newton), m = mass (kg), a = acceleration (m/s$^2$), v = velocity (m/s), s = distance (m), and t = time (s).

The angular motion of a rigid body about a fixed axis at a given point of the body under constant gravitational acceleration (9.8 m/s$^2$) is calculated from:

$$M = I\alpha \qquad \omega = v'/r \qquad \alpha = a'/r$$

where M = the applied moment about the COM or about the fixed point where the axis of rotation is located, I = the inertial moment about this same COM or fixed point, $\alpha$ = angular acceleration $(rad/s^2)$, $\omega$ = angular velocity (rad/s), r = radius (m), $v^t$ = tangential velocity (m/s), and $a^t$ = tangential acceleration $(m/s^2)$.

The angular velocity $\omega$ for a rigid body of length L rotating about a fixed point is calculated from:

$$\tfrac{1}{2}I_0\omega^2 = maL/2 \qquad I_0 = (1/3)\,mL^2$$

where $I_0$ = the initial inertial moment, $\omega$ = angular velocity (rad/s), m = mass (kg), a = gravitational acceleration $(9.8\ m/s^2)$, and L = length.

## REFERENCES

1. Chadwick DL, Chin S, Salerno C, et al. Deaths from falls in children: how far is fatal? *J Trauma* 1991;31:1353–5.
2. Williams RA. Injuries in infants and small children resulting from witnessed and corroborated free falls. *J Trauma* 1991;31:1350–2.
3. Duhaime AC, Alario AJ, Lewander WJ, et al. Head injury in very young children: mechanisms, injury types, and ophthalmologic findings in 100 hospitalized patients younger than 2 years of age. *Pediatrics* 1992;90:179–85.
4. Lyons TJ, Oates RK. Falling out of bed: a relatively benign occurrence. *Pediatrics* 1993;92:125–7.
5. Swalwell C. Head injuries form short distance falls. *Am J Forensic Med Pathol* 1993;14:171–2.
6. Sheridan F, Anthony RM, Rieber GD, et al. Head injuries from short distance falls. *Am J Forensic Med Pathol* 1993; 14:172–3.
7. Duhaime AC, Christian CW, Rorke LB, et al. Non-accidental head injury in infants: the "shaken baby syndrome." *N Engl J Med* 1998;338:1822–1829.
8. Case ME, Graham MA, Corey Handy T, et al. Position paper on shaken baby. Adopted by the Board of Directors, United States National Association of Medical Examiners, San Francisco, October 30, 1998. St. Louis: The National Association of Medical Examiners.
9. Showers J. Never shake a baby. The Second National Conference on Shaken Baby Syndrome. National Association of Children's Hospitals and Related Institutions, 1999. Available at: www.childrenshospitals.net/nachri/news/pr%5Fsbs.html.
10. Tullous M, Walker MD, Wright LC. Evaluation and treatment of head injuries in children. In Fuhrman BP, Zimmerman JJ, eds. *Pediatric critical care*. St. Louis: Mosby Year Book, 1992:1165–82.
11. Willman KY, Bank DE, Senac M, Chadwick DL. Restricting the time of injury in fatal inflicted head injury. *Child Abuse Negl* 1997;21:929–40.
12. Amaya M, Bechtel K, Blatt SD, et al. Shaken baby syndrome and the death of Matthew Eappen. (November 11, 1997). Available at: www.silcon.com/&thksim;ptave/shaken.htm.
13. Jenny C, Hymel KP. Recognizing abusive head trauma in children. *JAMA* 1999;282:1421–2.
14. Eisenbrey AB. Retinal hemorrhage in the battered child. *Childs Brain* 1979;5:40–4.
15. Greenwald MJ, Weiss A, Oesterle CS, et al. Traumatic retinoschisis in battered babies. *Ophthalmology* 1986;93:618–24.
16. Rao N, Smith RE, Choi JH, et al. Autopsy findings in the eyes of fourteen fatally abused children. *Forensic Sci Int* 1988;39:293–9.
17. Elner SG, Elner VM, Arnall M, Albert DM. Ocular and associated systemic findings in suspected child abuse: a necropsy study. *Arch Opthalmol* 1990;108:1094–101.
18. Williams DF, Swengel RM, Scharre DW. Posterior segment manifestations of ocular trauma. *Retina* 1990;10 (suppl):535–44.
19. Rosenberg NM, Singer J, Bolte R, et al. Retinal hemorrhage. *Pediatr Emerg Care* 1994;10:303–5.
20. Swenson J, Levitt C. Shaken baby syndrome: diagnosis and prevention. *Minn Med* 1997;80:41–4.
21. Altman RL, Kutscher ML, Brand DA. The "shaken-baby syndrome." *N Engl J Med* 1998;339:1329–30.
22. Hall JR, Reyes HM, Horvat M, et al. The mortality of childhood falls. *J Trauma* 1989;29:1273–5.
23. Rieber GD. Fatal falls in childhood: how far must children fall to sustain fatal head injury: report of cases and review of the literature. *Am J Forensic Med Pathol* 1993;14:201–7.
24. Root I. Head injuries from short distance falls. *Am J Forensic Med Pathol* 1992;13:85–7.
25. Nashelsky MB, Dix JD. The time interval between lethal infant shaking and onset of symptoms: a review of the shaken baby syndrome literature. *Am J Forensic Med Pathol* 1995;16:154–7.
26. Wilkins B. Head injury: abuse or accident? *Arch Dis Child* 1997;76:393–7.
27. Shaken babies (editorial). *Lancet* 1998;352:335.
28. Plunkett J. Restricting the time of injury in fatal inflicted head injuries. *Child Abuse Negl* 1998;22:943–4.
29. Sweeney TB. X-rated playgrounds? *Pediatrics* 1979;64:961.
30. Tursz A, LeLong N, Crost M. Home accidents to children under 2 years of age. *Paediatr Perinatol Epidemiol* 1990;4:408–21.
31. National Injury Information Clearinghouse. US Consumer Product Safety Commission (1997). Washington DC 20207. Available at: www.cpsc.gov/about/clrnghse.html.
32. Consumer Product Safety Review 1999;4:#2:3–7. Available at: www.cpsc.gov/cpscpub/pubs/cpsr.html.
33. A description of the injury or potential injury incident data base (IPII). Division of Hazard and Injury Data Systems. US Consumer Product Safety Commission (1997). Washington DC 20207. Available at: www.cpsc.gov/about/guide.html#OIPA.
34. A description of the indepth investigation database (INDP), fiscal year 1987–fiscal year 1991. Division of Hazard and Injury Data Systems. US Consumer Product Safety Commission (1992). Washington D.C. 20207. Available at: www.cpsc.gov/about/guide.html#OIPA.
35. Ommaya AK, Gennarelli TA. Cerebral concussion and traumatic unconsciousness. *Brain* 1974;97:633–54.
36. Ommaya AK. Head injury mechanisms and the concept of preventive management: a review and critical synthesis. *J Neurotrauma* 1995;12:527–46.
37. Gurdjian ES, Hodgson VR, Thomas LM, Patrick LM. Significance of relative movements of scalp, skull and intracranial contents during impact injury of the head. *J Neurosurg* 1968;29:70–2.
38. Ommaya AK, Grubb RL, Naumann RA. Coup and contra-coup injury: observations on the mechanics of visible brain injuries in the rhesus monkey. *J Neurosurg* 1971;35:503–16.
39. Gurdjian ES. Recent advances in the study of the mechanism of impact injury of the head: a summary. *Clin Neurosurg* 1972;19:1–42.
40. Gennarelli TA, Thibault LE, Adams JH, et al. Diffuse axonal injury and traumatic coma in the primate. *Ann Neurol* 1982;12:564–74.
41. McElhaney JH, Roberts VL, Hilyard JF. Head injury tolerance and criteria. In *Handbook of human tolerance*. Yatabecho, Tukuba-gun, Ibaraki, Japan: Japan Automobile Research Institute, Inc., 1976:237–335.
42. Gurdjian ES, Hodgson VR, Thomas LM, Patrick LM. Impact head injury: mechanism and prevention. In Brinkhous

KM (ed), *Accident pathology.* Proceedings of an International Conference; June 6–8, 1968; Washington DC (US). USDT, FHA, NHSB #FH 11-6595, 1968:140–143.

43. Aoki N, Masuzawa H. Infantile acute subdural hematoma. *J Neurosurg* 1984;61:272–80.

44. Greenes DS, Schutzman SA. Occult intracranial injury in infants. *Ann Emerg Med* 1998;32:680–6.

45. Berger SA, Goldsmith W, Lewis ER, eds. *Introduction to bioengineering.* New York: Oxford University Press, 1996.

46. Ewing, CL, Thomas DJ, Patrick LM, et al. Living human dynamic response to Gx impact acceleration. II. Accelerations measured on the head and neck. Proceedings, Thirteenth Stapp Car Crash Conference, 1969, December 2–4, Boston, MA. New York: Society of Automotive Engineers, Inc., 1969:400–15.

47. Ommaya AK, Yarnell P. Subdural haematoma after whiplash injury. *Lancet* 1969;294:237–9.

48. Gurdjian ES, Lissner HR, Patrick LM. Protection of the head and neck in sports. *JAMA* 1962;182:509–12.

49. Gurdjian ES, Roberts UL, Thomas LM. Tolerance curves of acceleration and intracranial pressure and protective index in experimental head injury. *J Trauma* 1966;6:600–4.

50. Mahajan BM, Beine WB. Impact attenuation performance of surfaces installed under playground equipment: report to the Consumer Product Safety Commission. US Department of Commerce, National Bureau of Standards, Washington, DC: Feb 1979. Publication No. NBSIR 79-1707.

51. Reichelderfer TE, Overbach A, Greensher J. X-rated playgrounds? *Pediatrics* 1979;64:962–3.

52. Collantes M. Playground surfaces and head injury: evaluation of the importance of using the Head Injury Criterion (HIC) to estimate the likelihood of head impact injury as a result of a fall onto playground surface materials. US Consumer Product Safety Commission (1990). Washington D.C. 20207. Available at: www.cpsc.gov/cpscpub/pubs/3005.html.

53. Weber W. Experimental studies of skull fractures in infants. *Z Rechtsmed* 1984;92:87–94.

54. Weber W. Biomechanical fragility of the infant skull. *Z Rechtsmed* 1985;94:93–101.

55. Irwin A, Mertz HJ. Biomechanical basis for the CRABI and Hybrid III child dummies. New York: Society of Automotive Engineers, Inc., Document #973317, 1997:261–72.

56. *Handbook for public playground safety.* Washington, DC: US Consumer Product Safety Commission, Pub No. 325, 1997. Available at: www.cpsc.gov/cpscpub/325.html.

57. Goldsmith W. Current controversies in the stipulation of head injury criteria. *J Biomech* 1981;12:883–4.

58. Goldsmith W. Meaningful concepts of head injury criteria. In Proceedings of IRCOBI Conference; 1989 Sept 13–15; Stockholm, Sweden. France: Bron, IRCOBI Secretariat; 1989:1–11.

59. Gurdjian ES. The mechanism of skull fracture. *J Neurosurg* 1950;7:106–14.

60. Evans FG, Lissner HR, Lebow M. The relation of energy, velocity, and acceleration to skull deformation and fracture. *Surg Gynicol Obstet* 1958;106:593–601.

61. Gennarelli TA, Thibault LE. Biomechanics of acuté subdural hematoma. *J Trauma* 1982;22:680–6.

62. Duhaime AC, Gennarelli TA, Thibault LE, et al. The shaken baby syndrome: a clinical, pathological and biomechanical study. *J Neurosurg* 1987;66:409–15.

63. Cory CZ. Assessing the severity of child head impacts onto various domestic surface mixtures. MPhil Thesis, School of Engineering, Cardiff University, Wales (UK). May 1998. Available at: http://library.cf.ac.uk/

64. Howard MA, Bell BA, Uttley D. The pathophysiology of infant subdural haematomas. *Br J Neurosurg* 1993;7:355–65.

65. Zimmerman RA, Bilaniuk LT, Bruce D, et al. Computed tomography of craniocerebral injury in the abused child. *Radiology* 1979;130:687–90.

66. Merten DF, Osborne DRS. Craniocerebral trauma in the child abuse syndrome. *Pediatr Ann* 1983;12:882–7.

67. Merten DF, Osborne DRS, Radkowski MA, Leonidas JC. Craniocerebral trauma in the child abuse syndrome: radiologic observations. *Pediatr Radiol* 1984;14:272–7.

68. Kleinman PD. Head trauma. In Kleinman PK (ed). *Diagnostic imaging of child abuse.* Baltimore: Williams & Wilkins, 1987:159–99.

69. Magoun HW. *The waking brain.* Springfield, IL: Thomas, 1958.

70. Plum F, Posner JB. *The diagnosis of stupor and coma.* Philadelphia: Davis; 1966.

71. Blumbergs PC, Jones NR, North JB. Diffuse axonal injury in head trauma. *J Neurol Neurosurg Psychiatry* 1989;52:838–41.

72. Oppenheimer DR. Microscopic lesions in the brain following head injury. *J Neurol Neurosurg Psychiatry* 1968;31:299–306.

73. Johnson DL, Boal D, Baule R. Role of apnea in non-accidental head injury. *Pediatr Neurosurg* 1995;23:305–10.

74. Atkinson JLD. The neglected pre-hospital phase of head injury: apnea and catecholamine surge. *Mayo Clin Proc* 2000;75:37–47.

75. Teasdale E, Cardoso E, Galbraith S, Teasdale G. CT scans in severe diffuse head injury: physiopathology and clinical correlations. *J Neurol Neurosurg Psychiatry* 1984;47:600–3.

76. Levin HS, Mendelsohn D, Lilly MA, et al. Magnetic resonance imaging in relation to functional outcome of pediatric closed head injury: a test of the Ommaya-Gennarelli model. *Neurosurgery* 1997;40:432–41.

77. Bruce DA, Alavi A, Bilaniuk L, et al. Diffuse cerebral swelling following head injuries in children: the syndrome of "malignant brain edema." *J Neurosurg* 1981;54:170–8.

78. Rockswold GL, Leonard RP, Nagib MG. Analysis of management in thirty-three closed head injury patients who "talked and deteriorated." *Neurosurgery* 1987;21:51–5.

79. Snoek JW, Minderhoud JM, Wilmink JT. Delayed deterioration following mild head injury in children. *Brain* 1984;107:15–36.

80. Christian CW, Taylor AA, Hertle RW, Duhaime AC. Retinal hemorrhage caused by accidental household trauma. *J Pediatr* 1999;135:125–7.

81. Smith DC, Kearns TP, Sayre GP. Pre-retinal and optic nerve sheath hemorrhage: pathologic and experimental aspects in subarachnoid hemorrhage. *Trans Am Acad Ophthalmol Otolaryngol* 1957;61:201–11.

82. Lehman RAW, Krupin T, Podos SM. Experimental effect of intracranial hypertension upon intraocular pressure. *J Neurosurg* 1972;36:60–6.

83. Vanderlinden RG, Chisholm LD. Vitreous hemorrhages and sudden increased intracranial pressure. *J Neurosurg* 1974;41:167–76.

84. Kirschner RH, Stein RJ. The mistaken diagnosis of child abuse: a form of medical abuse? *Am J Dis Child* 1985;139:873–5.

85. Weedn VW, Mansour AM, Nichols MM. Retinal hemorrhage in an infant after cardiopulmonary resuscitation. *Am J Forensic Med Pathol* 1990;11:79–82.

86. David DB, Mears T, Quinlan MP. Ocular complications associated with bungee jumping. *Br J Ophthalmol* 1994;78:234–5.

87. Jain BK, Talbot EM. Bungee jumping and intraocular hemorrhage. *Br J Ophthalmol* 1994;78:236–7.

88. Edlow JA, Caplan LR. Avoiding pitfalls in the diagnosis of subarachnoid hemorrhage. *N Engl J Med* 2000;342:29–36.

89. Becker H, Gupta BK. Recognizing abusive head trauma in children. *JAMA* 1999;282:1421.

90. Hall JG, Levin J, Kuhn JP, et al. Thrombocytopenia with absent radius (TAR). *Medicine (Baltimore)* 1969;48: 411–39.

91. Pozzati E, Giuliani G, Poppi M, Faenza A. Blunt traumatic carotid dissection with delayed symptoms. *Stroke* 1989;20:412–6.

92. Martin PJ, Enevoldson TP, Humphrey PRD. Causes of ischaemic stroke in the young. *Postgrad Med J* 1997;73:8–16.

# APPENDIX D

# Delayed Sudden Death in an Infant Following an Accidental Fall

## A Case Report With Review of the Literature

*Scott Denton, MD, and Darinka Mileusnic, MD, PhD*

**Abstract:** Several controversies exist regarding ultimately lethal head injuries in small children. Death from short falls, timing of head injury, lucid intervals, presence of diffuse axonal injury (DAI), and subdural hematoma (SDH) as marker of DAI are the most recent controversial topics of debate in this evolving field of study. In this area of debate, we present a case of delayed death from a witnessed fall backwards off a bed in a 9-month-old black male child who struck his head on a concrete floor and was independently witnessed as "healthy" postfall for 72 hours until he was discovered dead in bed. Grandmother, babysitter, and mother all independently corroborated under police investigation that the child "acted and behaved normally" after the fall until death. Autopsy showed a linear nondisplaced parietal skull fracture, diastasis of adjacent occipital suture, subgaleal hemorrhage with evidence of aging, small posterior clotting SDH, marked cerebral edema, and a small tear of the midsuperior body of the corpus callosum consistent with focal axonal injury (FAI). No DAI was seen, and there were no retinal hemorrhages. All other causes of death were excluded upon thorough police and medical examiner investigation. Although this seems to be a rare phenomenon, a delayed, seemingly symptom-free interval can occur between a clinically apparent mild head injury and accidental death in a young child.

*(Am J Forensic Med Pathol* 2003;24: 371–376)

## CASE REPORT

A 9-month-old black male child weighing 22 pounds (10 kg) and measuring 28 inches (71 cm), 80th percentile and 50th percentile for age, respectively, with a history of asthma

Manuscript received March 19, 2003; accepted May 29, 2003.

From the Cook County Office of the Medical Examiner, and Department of Pathology, Rush College of Medicine, Chicago, Illinois (J.S.D.), and Knox County Office of the Medical Examiner. and Department of Pathology, Graduate School of Medicine, University of Tennessee, Knoxville, Tennessee (D.M.).

Reprints: Darinka Mileusnic, MD, PhD, Regional Forensic Center, University of Tennessee Memorial Hospital, 1924 Alcoa Highway, Knoxville, TN 37920. E-mail: dmileusn@mc.utmck.edu

Copyright © 2003 by Lippincott Williams & Wilkins

0195-7910/03/2404-0371

DOI: 10.1097/01.paf.0000097851.18478.16

treated with nebulizer, was witnessed by his grandmother to fall backwards off the edge of a queen-sized bed, 30 inches off the floor. The child was sitting on the edge of the bed as the grandmother dressed her 2-year-old daughter. The child fell backwards and rotated from the sitting position, striking the midback of his head on a vinyl-covered concrete floor at 8:00 AM. He immediately began crying, and the grandmother placed ice on a knot on the back of his head. He stopped crying and was consolable within a few minutes. The child was taken to the babysitter's residence, where the babysitter was told of the fall and to watch for any behavioral changes. The mother was at work the morning when the fall occurred. When the mother picked the child up at the babysitter's in the afternoon, he appeared well. The babysitter reported no problems and that he acted, ate, and behaved as usual. For the next 2 days, the grandmother, mother, and babysitter did not notice any abnormalities in either behavior or appearance of the child.

Approximately 72 hours after the fall off the bed, the child was found at the foot of the mother's bed, where he usually slept, prone, cold, and unresponsive. Paramedics were called, and in spite of resuscitative efforts, he was pronounced dead upon arrival at the hospital. He was last seen alive 8 hours prior when he was fed by his mother and given his usual albuterol breathing treatment. No abnormalities on the child were seen in the emergency department. There was no evidence of overlying or asphyxia.

Medical and family history revealed that the child was born full-term weighing 7 pounds 4 ounces. He was diagnosed with asthma after complaints of wheezing episodes and was prescribed an albuterol nebulizer twice daily. The child's father, who does not reside in the home, has asthma. The mother and grandmother reside together in a public housing development. Department of Child and Family Services records revealed no prior incidents concerning the deceased, but the mother had 1 report of being a victim of prior abuse. The grandmother has a remote history of cocaine abuse. Her 2-year-old daughter is well and lives with her.

Autopsy revealed a well-developed and well-nourished black male child appearing the stated age and without exter-

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

nal abnormality. There was no swelling or contusion of the back of the head. Complete postmortem radiographs revealed a linear, nondisplaced, posterior right parietal skull fracture. Internal examination confirmed the skull fracture, as well as a patch or right posterior subgaleal hemorrhage that was centrally red with yellow margins. The underlying right posterior linear skull fracture was 3.0 inches (9.0 cm) long and extended to the right parieto-occipital suture, causing mild diastasis of the suture, 2.5 inches (7.5 cm) long (Fig. 1). There was a thin adherent clotted SDH underlying the fracture, 2.0 × 2.0 × 0.1 cm. The brain weighed 1035 g (expected average weight for age, 750 g) and showed severe edema with flattening of the gyri, loss of sulci, and notching of both unci and cerebellar tonsils (Fig. 2). After formalin fixation, serial sectioning of the brain revealed diffusely dusky white matter and a focal tear of the midsuperior corpus



**FIGURE 2.** Severely edematous brain demonstrating flattening of the gyri and narrowing of the sulci.



**FIGURE 1.** View of the linear skull fracture involving the posterior right parietal bone, after removal of the overlying subgaleal hemorrhage.

callosum, 1 mm, with surrounding hemorrhage, 2 mm. There were no other gross neuropathologic findings. The remaining internal organs were unremarkable, without other new or old fractures, petechiae, or gross asthma changes. Comprehensive toxicologic screening using gas chromatography and mass spectrometry was negative. Microscopically, the corpus callosum tear showed hemorrhage with intact red blood cells, FAI, and microglial activation without inflammation (Fig. 3). Extensive sections of the brain showed only edema without evidence of DAI. Sections of the subgaleal hemorrhage showed hemorrhage of coalescing red blood cells with neutrophilic inflammation. Decalcified sections of the parietal fracture showed an acute fracture with early periosteal reaction at the fracture margin. Lung sections showed mild focal peribronchial lymphocytic aggregates consistent with bronchitis without asthma changes. There were neither eosinophils nor mucus plugs. Sections of remaining organs were

© *2003 Lippincott Williams & Wilkins*

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.



**FIGURE 3.** Coronal section of the corpus callosum showing wedge-shaped laceration (right upper corner) surrounded by a rim of hemorrhage, FAI and activated microglia (100×, hematoxylin-eosin).

without pathologic changes. The eyes were examined by an ophthalmic pathologist consultant and were normal. A forensic radiologist consultant also reviewed postmortem radiographs and reported no additional findings.

### Follow-up Investigation

Prior to the autopsy, Chicago police detectives were notified of the skull fracture and attended the examination. After autopsy, police remanded the grandmother and mother to the police station, where they were interviewed separately about the injuries. Upon extensive questioning about any possibility of inflicted trauma and abuse that the baby could have sustained, they both spontaneously gave the similar story of the fall 3 days prior. The babysitter was questioned and confirmed the accounts and timing of the reported events. Police detectives and evidence technicians accompanied the mother and grandmother back to their residence and verified the scene and reenactment of the fall. A week later, the prosector pathologist (JSD) and a specialist child death scene investigator of the Medical Examiner's Office went to the residence and again inspected the residence, interviewed the grandmother and mother, and reenacted the fall. As with the police detectives, all felt the grandmother and mother to be truthful and grieving appropriately for the circumstances. After consideration of the autopsy, toxicologic, histologic, consultative, and investigative findings, the death was certified as craniocerebral injuries due to a fall from the bed backwards onto a concrete floor. The manner was determined accidental.

### DISCUSSION

Certain issues in pediatric head trauma, such as lethality of short falls, timing of head injury, and presence of DAI

in the majority of lethal events, are still controversial. One widely held belief is that short falls are almost never fatal. Second, if a child is going to die following head trauma, either accidental or abusive, he or she is severely impaired and most likely immediately unconscious, without a lucid interval. Finally, in severe injuries where children are immediately comatose and die shortly after the incident from either shaking and/or direct impact, it is believed that DAI is the mechanism. Certain reviews have gone so far to identify subdural hemorrhage, frequently present in certain forms of early childhood abusive head trauma, as a "marker" of undetectable DAI.[1] If this were true, then reports describing radiologically present old and/or new subdural hemorrhages, with or without focal shear hemorrhages in the white matter, in living children would be a rarity rather than a common place.[2]

In this present case, we discuss the death of a 9-month-old child who died 3 days after a witnessed backward fall from a bed on a concrete floor. Main pathologic findings consisted of a linear nondisplaced skull fracture, minimal clotting subdural hemorrhage, severe brain swelling with tonsillary herniation, and a small tear in the body of the corpus callosum, which appeared histologically as FAI. Analysis of the fall revealed a rotational component of the body and head movement, which could account for the described injuries. The location and appearance of the primary injury was consistent with flipping backward and striking the back of the head. There was no diffuse axonal damage or retinal hemorrhage. Thorough workup, including scene investigation and independent police questioning of all individuals involved in the care of the infant, prior to, during, and after the accident, were unanimous. There were no inconsistencies, and the stories have never varied from the beginning to the conclusion of the investigation. There were no other instances of trauma to the head observed by the caretakers. Based on several independent accounts, the infant's behavior following the head trauma up to his sudden death was ordinary and did not require medical attention, qualifying as a lucid or symptom-free interval.

Deciding whether head injury in a very young child is accidental or nonaccidental has always been problematic for clinicians and forensic pathologists alike.[3,4] We realize that a number of child abuse experts would have a problem with the accidental determination of the manner of death in the present case. We do not argue the widely noted observation that simple falls from low heights rarely result in significant primary brain injury.[5] However, every fall is different, as well as the individual reaction to the primary insult. Some experts in head trauma consider the term *minor head injury* an oxymoron.[6] We believe that a series of secondary injuries, known to occur after a primary insult, resulted in the extreme swelling of the brain and death of the child. What is widely understated and sometimes forgotten about is secondary brain

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited

injury, which occasionally may be the principal force determining the outcome after a seemingly trivial head injury.[7–12] Another frequently forgotten factor is the influence of age and sex on the presentation and the outcome of head injury. The grouping together of different pathologies such as subdural hemorrhages, cerebral contusions, FAI, and DAI, as well as lumping together of infants, toddlers, and preschool children, needs to be addressed. It has been shown that infants and young toddlers lose consciousness less frequently, and a smaller proportion of their head injuries lead to immediate coma in comparison to other children with the same grades of traumatic energy.[13] Pohl et al[9] demonstrated that evolution of posttraumatic brain damage after head trauma in developing rodents is a highly dynamic process exhibiting age-dependent excitotoxic and distant apoptotic cell death.

Reviewing the literature on childhood head trauma, one can clearly see that a gradual sideway drift or evolution of findings and conclusions of the original reports, research, and data had taken place. One of them, also frequently encountered in court, is that very young children, especially infants, are automatically assumed to be the victims of "shaken baby syndrome."[14–16] However, from the literature and from personal experience, findings of direct impact to the head prevail. The problem is not only semantic in nature but has major and far-reaching consequences since the character, location, and clinical presentation of the injuries are different from the rare purely shaken babies.[17,18]

Another encountered fallacy is that the children who die of head trauma, especially abusive head trauma, sustain DAI. Going back to some of the original research, it is clear that the authors explicitly stated that the 2 worst types of head injury are SDH and DAI. These 2 have different mechanisms of causation: SDH occurs much more commonly in nonvehicular injuries, such as falls and abusive head trauma, while DAI is caused almost exclusively by vehicular mechanisms.[19–22] Although both injuries frequently share a common mechanical cause such as angular acceleration, they differ in degree. SDH usually occurs with a rotational injury of short duration and a high rate of acceleration. Conversely, motor vehicle accidents tend to cause longer-duration, lower-acceleration-rate injuries leading to DAI rather than SDH.[8,21] SDHs occur in a greater number in children with inflicted versus noninflicted traumatic brain injury, whereas shear injuries are commonly visualized in the noninflicted injury group.[22] Therefore, current supposition that the presence of SDH is a marker of DAI is likely inaccurate.

A frequently asked question is whether delayed mental status deterioration can occur following head injury in children. This is critically important in unwitnessed circumstances such as child abuse. A widely held dogma is that if a child becomes unresponsive while in the care of an individual who is reporting the onset of unconsciousness, that same individual must be the perpetrator. Currently, some special-

ists involved in the care of abused children accept as true that all children who eventually die, regardless of the type of the head injury, must be severely disabled, usually comatose from the very moment the injury occurred.[23] From personal experience and based on the literature review, this tenet is not necessarily true.[24,25] Although there are clearly scenarios in which this principle could be applicable, there is undoubtedly a subpopulation of infants and especially toddlers with a completely different constellation of injuries and a dissimilar presentation. Occasionally, these children have nonspecific symptoms for several hours to a day prior to the onset of either coma or seizure followed by coma. Common observations include reduced physical activity, lethargy, drowsiness, irritability, temperature irregularities, poor feeding, and gastrointestinal symptoms.[23,26,27] Careful analysis of the history and the events leading to the critical symptoms indicate that there was a certain progression of symptomatology.

Occult intracranial injury in infants younger than 12 months of age is not uncommon.[28] Clinical symptoms and signs are insensitive indicators of intracranial injury in infants.[29] Radiologic observations can sometimes be of limited value as well.[30] Also, slow deterioration following mild head injuries in children have been reported.[31] Furthermore, 1 of the most frequently cited articles on restricting the time of injury in fatal inflicted head injuries draws its pediatric population mainly from motor vehicle accidents, with the average age of the study group patients being 8.5 years, with a SD of 4.0 years.[32]

Although many studies have offered guidelines for determining the age of cerebral injuries, various factors limit the reliability of these methods; for example, reduced cerebral blood flow may impede the cellular response. Not infrequently, injured children survive in the hospital for additional 2 to 3 days or even longer, sometimes undergoing craniotomy, rendering timing of the injuries based on the autopsy findings, including histologic examination of the cerebral injuries, extremely difficult.[8,23,33–35]

DAI is most likely a rarity in nonaccidental head trauma, and the term is misleading.[17,18,36] Coma may be more of a reflection of the severity of axonal damage in particular regions of the brain, most notably the brainstem, rather than the total sum of axonal injury distributed throughout the brain. Furthermore, the plane of head rotational acceleration plays an important role in determining both the distribution of axonal damage and the production of coma.[36] The localized axonal damage demonstrated in corticospinal tracts in the lower brainstem and rostral cervical cord, presumably caused by stretch to the neuroaxis produced by cervical hyperextension, may be more significant. This finding also provides an explanation for the frequent occurrence of apnea at presentation. In many of the cases reported by Geddes et al,[18] the axonal damage at the craniocervical junction was survivable; what was life-threatening was the subsequent hypoxic injury

© 2003 Lippincott Williams & Wilkins

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

and brain swelling. In addition, true contusional tears, which are peculiar to the brains of young infants, represent localized "shearing" between gray and white matter after an impact and should not automatically imply DAI.[17]

Cerebral hypoperfusion, followed by hypoxia/ischemia and diffuse brain swelling, characteristic in injured children younger than 24 months of age, are key pathophysiological findings associated with poor outcome following severe traumatic brain injury.[8,37–39] Primary brain damage occurs at impact and appears immediately or shortly after injury. Secondary brain injury may be more important, particularly in delayed fatalities, and occurs distant to the impact. Secondary events may not become apparent until several hours after injury. The largest controlled neuropathological study of nonaccidental infant head injury showed that axonal damage occurred in the brain of both head-injured subjects and in controls in the same distribution. This is not DAI but rather diffuse vascular or hypoxic-ischemic injury due to brain swelling and raised intracranial pressure. The study demonstrated that the diffuse brain damage responsible for loss of consciousness is a hypoxic secondary reaction and argues against DAI. One of the main conclusions of the study was that focal, localized axonal injury and secondary vascular-hypoxic changes characterize the mechanism of brain death.[18]

In conclusion, we present a case of a seemingly minor brain injury in an infant with a symptom-free interval, which resulted in delayed, sudden death. The importance of the mechanism of injury, location of injury, age of the child, and secondary brain injury with special reference to non-accidental head trauma of childhood, as well as need for further research, are discussed. Although this is a rare presentation of a traumatic brain injury, based on recent advances in traumatic neuropathology, it is conceivable, as in this case, that a delayed asymptomatic deterioration to death can occur.

## REFERENCES

1. Case ME, Graham MA, Corey Handy T, et al. Position paper on fatal abusive head injuries in infants and young children. *Am J Forensic Med Pathol.* 2001;22:112–122.
2. Demaerel P, Casteels I, Wilms G. Cranial imaging in child abuse. *Eur Radiol.* 2002;12:849–857.
3. Maxeiner H. Lethal subdural bleedings of babies: accident or abuse? *Med Law.* 2001;20:463–482.
4. Fung ELW, Sung RYT, Severn Nelson EA, Poon WS. Unexplained subdural hematoma in young children: is it always child abuse? *Pediatr Internat.* 2002;44:37–42.
5. Duhaime AC, Alario AJ, Lewander WJ, et al. Head injury in very young children: mechanisms, injury types, and ophthalmologic findings in 100 hospitalized patients younger than 2 years of age. *Pediatrics.* 1992;90:179–185.
6. Schutzman SA, Greenes DS. Pediatric minor head trauma. *Ann Emerg Med.* 2001;37:65–74.
7. Bruce DA. Head injuries in the pediatric population. *Curr Probl Pediatr.* 1990;20:61–107.
8. Pearl GS. Traumatic neuropathology. *Clin Lab Med.* 1998;18:39–64.
9. Pohl D, Bittigau P, Ishimaru MJ, et al. N-methyl-D-aspartate antagonists and apoptotic cell death by head trauma in developing rat brain. *Proc Natl Acad Sci. USA.* 1999;96:2508–2513.
10. Gilles EE, Nelson MD. Cerebral complications of nonaccidental head injury in childhood. *Pediatr Neurol.* 1998;19:119–128.
11. Bergsneider M, Hovda D, Lee SM, et al. Dissociation of cerebral glucose metabolism and level of consciousness during the period of metabolic depression following human traumatic brain injury. *J Neurotrauma.* 2000;17:389–401.
12. Ruppel RA, Clark RS, Bayir H, et al. Critical mechanisms of secondary damage after inflicted head injury in infants and children. *Neurosurg Clin North Am.* 2002;13:169–182.
13. Barney J, Froidevaux A-C, Favier J. Paediatric head trauma: influence of age and sex, II: biomechanical and anatomo-clinical correlations. *Child Nerv Syst.* 1994;10:517–523.
14. Caffey J. On the theory and practice of shaking infants: its potential residual effects of permanent brain damage and mental retardation. *Am J Dis Child.* 1972;124:161–169.
15. Caffey J. The whiplash shaken infant syndrome: manual shaking by the extremities with whiplash-induced intracranial and intraocular bleedings, linked with residual permanent brain damage and mental retardation. *Pediatrics.* 1974;54:396–403.
16. Levin AV. Retinal haemorrhages and child abuse. *Rec Adv Paediatr.* 2000;18:151–219.
17. Geddes JF, Hackshaw AK, Vowles GH, et al. Neuropathology of inflicted head injury in children, I: patterns of brain damage. *Brain.* 2001;124:1290–1298.
18. Geddes JF, Vowles GH, Hackshaw AK, et al. Neuropathology of inflicted head injury in children, II: microscopic brain injury in infants. *Brain.* 2001;124:1299–1306.
19. Gennarelli TA, Thibault LE. Biomechanics of acute subdural hematoma. *J Trauma.* 1982;22:680–686.
20. Gennarelli TA, Thibault LE, Adams JH, et al. Diffuse axonal injury and traumatic coma in the primate. *Ann Neurol.* 1982;12:564–574.
21. Gennarelli TA. Head injury in man and experimental animals: clinical aspects. *Acta Neurochir.* 1983;32(suppl):1–13.
22. Ewing-Cobbs L, Kramer L, Prasad M, et al. Neuroimaging, physical, and developmental findings after inflicted and noninflicted traumatic brain injury in young children. *Pediatrics.* 1998;102:300–307.
23. Duhaime A-C, Christian CW, Balian Rorke L, Zimmerman RA. Nonaccidental head injury in infants-the "shaken-baby syndrome." *N Engl J Med.* 1998;338:1822–1829.
24. Nashelsky MB, Dix JD. The time interval between lethal infant shaking and onset of symptoms: a review of the shaken baby syndrome literature. *Am J Forensic Med Pathol.* 1995;16:154–157.
25. Huntington RW III. Symptoms following head injury. *Am J Forensic Med Pathol.* 2002;23:105.
26. Ward JD. Pediatric issues in head trauma. *New Horiz.* 1995;3:539–545.
27. Haviland J, Ross Russell RI. Outcome after severe non-accidental head injury. *Arch Dis Child.* 1997;77:504–507.
28. Greenes DS, Schutzman SA. Occult intracranial injury in infants. *Ann Emerg Med.* 1998;32:680–686.
29. Greenes DS, Schutzman SA. Clinical indicators of intracranial injury in head-injured infants. *Pediatrics.* 1999;104:861–867.
30. Dias MS, Backstrom J, Falk M, Veetai L. Serial radiography in the infant shaken impact syndrome. *Pediatr Neurosurg.* 1998;29:77–85.
31. Snoek JW, Minderhoud JM, Wilmink JT. Delayed deterioration following mild head injury in children. *Brain.* 1984;107:15–36.
32. Willman KY, Bank DE, Senac M, Chadwick DL. Restricting the time of injury in fatal inflicted head injuries. *Child Abuse Negl.* 1997;21:929–940.
33. McD. Anderson R, Opeskin K. Timing of early changes in brain trauma. *Am J Forensic Med Pathol.* 1998;19:1–9.
34. Wilkinson AE, Bridges LR, Sivaloganathan S. Correlation of survival time with size of axonal swellings in diffuse axonal injury. *Acta Neuropathol.* 1999;98:197–202.
35. Oehmichen M, Theuerkauf I, Meissner C. Is traumatic axonal injury (AI) associated with an early microglial activation? Application of a double-labeling technique for simultaneous detection of microglial and AI. *Acta Neuropathol.* 1999;97:491–494.

© *2003 Lippincott Williams & Wilkins*

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

36. Smith DH, Nonaka M, Miller R, et al. Immediate coma following inertial brain injury dependent on axonal damage in the brainstem. *J Neurosurg.* 2000;93:315–322.
37. Adelson PD, Clyde B, Kochanek PM, et al. Cerebrovascular response in infants and young children following severe traumatic brain injury: a preliminary report. *Pediatr Neurosurg.* 1997;26:200–207.
38. Ewing-Cobbs L, Prasad M, Kramer L, Landry S. Inflicted traumatic brain injury: relationship of developmental outcome to severity of injury. *Pediatr Neurosurg.* 1999;31:251–258.
39. Tabori U, Kornecki A, Sofer S, et al. Repeat computed tomographic scan within 24–48 hours of admission in children with moderate and severe head trauma. *Crit Care Med.* 2000;28:840–844.

© *2003 Lippincott Williams & Wilkins*

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

# Diagnosis of Traumatic Diffuse Axonal Injury

*To the Editor:*

In the December 2003 issue of the *American Journal of Forensic Medicine and Pathology*, there was a case report written by Drs. Scott Denton and Darinka Mileusnic titled "Delayed Sudden Death in an Infant Following an Accidental Fall: A Case Report With Review of the Literature." This article presented a case of delayed death in a 9-month-old infant as a result of severe craniocerebral injuries, which were sustained from an accidental fall in the domestic environment. The authors had affirmed that there was no evidentiary finding of diffuse axonal injury (DAI). The scientific validity of this assertion remains in doubt since the authors neither mentioned nor performed any tissue β-amyloid precursor protein (β-APP) immunohistochemical analyses, given our current level of knowledge in the diagnosis of severe traumatic brain injury, including DAI.[1-6] Since the 1980s, tissue immunohistochemistry for β-APP has emerged as the most sensitive methodology and gold standard for the detection, confirmation, and diagnosis of diffuse and focal axonal injury. With the absence of any β-APP immunohistochemical confirmation of DAI, what the authors had referred to as a "laceration" of the splenium of the corpus callosum may actually represent Adam's grade II DAI[7,8] since DAI is accentuated in the splenium of the corpus callosum.[9] In Adam's grade I DAI, there is no gross evidence of axonal injury; however, there is diffuse β-APP immunopositivity for axonal injury. In Adam's grade II DAI, there are gross lesions (parenchymal hemorrhages) of the corpus callosum, in addition to β-APP tissue immunopositivity. In Adam's grade III DAI, there are gross lesions (parenchymal hemorrhages) of the corpus callosum and dorsolateral midbrain/pons, in addition to diffuse β-APP tissue immunopositivity.[7,8]

β-APP is a single membrane–spanning protein, which is present in membranous structures of the cell such as the endoplasmic reticulum, Golgi compartment, and the cell membrane, encoded by the APP gene localized to chromosome 21, and is ubiquitously expressed in many cell and tissue types, including endothelia, glia, and neurons of the brain. β-APP is a resource-rich molecule that is involved in diverse normal cell functions, being the center of many converging metabolic and regulatory pathways, including cell adhesion, intercellular signaling, membrane-to-nucleus signaling, cholesterol metabolism, gene transcription, axonal transport, and neurotrophic and neuroproliferative activity.[1]

In the neuron, β-APP is synthesized in the perikaryon and transported anterogradely and retrogradely in the axon by fast/rapid axonal transport (100 to 400 mm/day). In normal, structurally intact axons, β-APP does not accumulate to a level that allows its detection in tissue sections. However, once structural axonal injury and damage occur and the fast axonal transport is impaired, β-APP accumulates in the proximal and distal axonal segment to a level that allows its detection by tissue immunohistochemistry within 1.75 to 3 hours following injury. β-APP has been reported to remain detectable by tissue immunohistochemistry for up to 99 days following axonal injury.[1,6]

For this specified case report by Scott Denton and Darinka Mileusnic, β-APP tissue immunohistochemistry that is performed according to the recommended medicolegal protocol[10] may reveal grades I or II DAI. This finding may additionally and more interestingly reaffirm that children who sustain low grades of DAI may manifest a delayed, symptomatic, or fatal presentation.

**Bennet I. Omalu, MD**
Division of Forensic Neuropathology
Allegheny County Coroner's Office
Pittsburgh, Pennsylvania

## REFERENCES

1. Turner PR, O'Connor K, Tate WP, et al. Roles of amyloid precursor protein and its fragments in regulating neural activity, plasticity and memory. *Prog Neurobiol.* 2003;10:1–32.
2. Smith C, Graham DI, Geddes JF, et al. The interpretation of Beta-APP immunoreactivity: a response to C. Neiss et al., *Acta Neuropathol* (2002) 104:79. *Acta Neuropathol.* 2003;106:97–98.
3. Smith DH, Meaney DF, Shull WH. Diffuse axonal injury in head trauma. *J Head Trauma Rehabil.* 2003;18:307–316.
4. Medana IM, Esiri MM. Axonal damage: a key predictor of outcome in human CNS diseases. *Brain.* 2003;126:515–530.
5. Blumbergs PC, Scott G, Manavis J, et al. Topography of axonal injury as defined by amyloid precursor protein and the sector scoring method in mild and severe closed head injury. *J Neurotrauma.* 1995;12:565–572.
6. McKenzie KJ, McLellan DR, Gentleman SM, et al. Is β-APP a marker of axonal damage in short-surviving head injury? *Acta Neuropathol.* 1996;92:608–613.
7. Adams JH, Doyle D, Ford I, et al. Diffuse axonal injury in head injury: definition, diagnosis and grading. *Histopathology.* 1989;15:49–59.
8. Ellison D, Love S, Chimelli L, et al. *Neuropathology: A Reference Text of CNS Pathology.* Philadelphia, PA: Harcourt Publishers Limited; 2000.
9. Leclercq PD, McKenzie JE, Graham DI, et al. Axonal injury is accentuated in the caudal corpus callosum of head-injured patients. *J Neurotrauma.* 2001;18:1–9.
10. Geddes JF, Whitwell HL, Graham DI. Traumatic axonal injury: practical issues for diagnosis in medicolegal cases. *Neuropathol Appl Neurobiol.* 2000;26:105–116.

# Response to Letter From Dr. Omalu

We thank Dr. Omalu for his comments regarding our recent case report.[1] Dr. Omalu certainly seems knowledgeable in his review of β amyloid precursor protein (β-APP) and is apparently a strong advocate for β-APP immunohistochemistry in cases of head injury. Dr. Omalu stated that there was no scientific validity that diffuse axonal injury (DAI) was not there in our case. Dr. Omalu also asserted that the tear in the corpus callosum was an advanced stage of DAI. We would have expected to see microscopic evidence of DAI on the numer-

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

ous hematoxylin and eosin sections, given the time interval from the witnessed fall to the child's death. The tear of the corpus callosum was from the impact from the fall as the corpus callosum struck the falx cerebri. We would argue the assertion that $\beta$-APP is accepted as the most sensitive methodology and gold standard for detection of DAI and the medicolegal protocol referenced in Dr. Omalu's letter above is not accepted as such in our practices. We do not perform routine $\beta$-APP testing in our offices.

We respect Dr. Omalu's advocacy for $\beta$-APP testing, although we do not feel $\beta$-APP would have changed our conclusions or shown hidden DAI. We do note that we have received advertisements from Dr. Omalu and his Forensic Neuropathology Consultation Service for performing $\beta$-APP testing. As of note, in his advertisement Dr. Omalu states that in head injury deaths it "has been established and highly recommended that $\beta$-APP immunostaining be performed in multiple topographically targeted regions of the brain" and that applications include "timing of injury sustenance and determination of time of death." We are unaware of this timing of injury and death data that would surely solve the major critical problems in pediatric head injury deaths. We sincerely wish Dr. Omalu well in advancing his $\beta$-APP research and enterprise.

Sincerely,

**Scott Denton, MD**
Deputy Medical Examiner
Cook County Medical Examiners Office
Assistant Professor of Pathology
Rush University Medical Center
Chicago, IL

**Darinka Miluesnic, MD, PhD**
Assistant Chief Medical Examiner
Knox County Medical Examiners Office
University of Tennessee Medical Center
Knoxville, Tennessee

## REFERENCES

1. Denton S, Mileusnic D. Delayed sudden death in an infant following an accidental fall: a case report with review of the literature. *Am J Forensic Med Pathol.* 2003;24:371–376.

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.